Representative Stewart B. McKINNEY, et al., Plaintiffs,

v.

UNITED STATES DEPARTMENT OF the TREASURY, et al., Defendants.

Court No. 84–9–01320.

United States Court of International Trade.

July 23, 1985.

Washington Legal Foundation (Daniel J. Popeo and Paul D. Kamenar, Washington, D.C.), for plaintiffs.

Richard K. Willard, Acting Asst. Atty. Gen., David M. Cohen, Director, Dept. of Justice, Commercial Litigation Branch, Washington, D.C. (Velta A. Melnbrencis, New York City), for defendants.

*Memorandum Opinion and Order*

DiCARLO, Judge.

Members of Congress, a shareholder, a labor union, and five organizations seek to exclude from entry into the United States various products mined, produced, or manufactured in the Union of Soviet Socialist Republics (Soviet Union) allegedly by convict, forced, or indentured labor (forced labor).[1]

Defendants move to dismiss the action alleging plaintiffs lack standing and the action is moot. The motion is granted.

### I.

In February 1983, the United States Department of State sent to the Congress its *Report on Forced Labor in the U.S.S.R.* accompanied by a letter by the Under Secretary of State for Political Affairs stating that forced labor is used "to produce large amounts of primary and manufactured goods for both domestic and Western export markets."[2]

In September 1983, the Commissioner of Customs (Commissioner), citing the State Department report and congressional and public concern, sought approval from the Secretary of the Treasury (Secretary) to publish in the Federal Register a finding that certain products from the Soviet Union may be produced by forced labor making them ineligible for entry into the United States pending a final determination pursuant to section 307 of the Tariff Act of 1930, 19 U.S.C. § 1307 (1982), and section 12.42, Customs Regulations, 19 C.F.R. § 12.42 (1982).

In substance, section 307 prohibits importation of products produced in whole or in part by forced labor unless domestic production is insufficient to meet United States consumption demands for these products.[3]

In May 1984, the Secretary responded to the Commissioner in a letter which stated in part:

I have decided that no determination of any kind is warranted at this time. As you are aware, the Senate Finance Committee has directed the International Trade Commission to review this matter in depth. I think it necessary, given the current paucity of reliable information, to withhold any determination until we have the benefit of the International Trade Commission's study.[4]

On May 23, 1984, eighty-four members of Congress, including some of the congressional plaintiffs in this action, with plaintiffs Washington Legal Foundation, Union Mutual Foundation, and Constitutional Institute of America, petitioned the United States Customs Service (Customs) to bar importation of goods produced in the Soviet Union wholly or in part by forced labor.

The petitioners requested the Commissioner to:

exercise your duty under [19 C.F.R.] § 12.42(e)[5] that does *not* require the ap-

---

1. *See* footnote 19, *infra.*

2. Letter from Lawrence S. Eagleburger, Under Secretary of State for Political Affairs, to Sen. William Armstrong (February 9, 1983). The *Report* and letter are reprinted in *Forced Labor in the Soviet Union: Hearing Before the Subcommittee on Human Rights and International Organizations of the House of Representatives Committee on Foreign Affairs and the Commission on Security and Cooperation in Europe,* 98th Cong., 1st Sess. 96–125 (1983).

3. *See* Part II, *infra.*

4. Memorandum from Donald T. Regan, Secretary of the Treasury, to William von Raab, Commissioner, U.S. Customs Service (May 16, 1984), attached as Exhibit 3 to Plaintiffs' Memorandum in Opposition to Defendants' Motion for Judgment on the Pleadings.

5. 19 C.F.R. § 12.42 provides in part:
 (e) If the Commissioner of Customs finds at

proval of the Secretary, namely, to "promptly advise all district directors" that the information provided here and that is otherwise in your possession "reasonably but not conclusively indicates that merchandise within the purview of section 307 is being, or is likely to be, imported. . . ." The district directors shall then have the nondiscretionary duty to detain such goods and "withhold release of any such merchandise pending instructions" from you as to the further disposition of such goods. In other words, if you have already made an affirmative finding under § 12.42(f) that is awaiting Secretary Regan's approval, you have necessarily made the "reasonable" finding under § 12.42(e) and your duty is to so inform the district directors. [emphasis in original] [6]

In June, 1984, the Assistant Secretary for Enforcement and Operations of the Treasury (Assistant Secretary), wrote the petitioners, stating in part:

As you are no doubt aware, Commissioner von Raab already has made a proposed preliminary finding in this matter. However, because of the substantial foreign policy implications of implementing immediately a preliminary finding, Com-

missioner von Raab forwarded his preliminary determination to the Treasury Department for approval. The affect of this was to telescope a two-step process into a single step in which the Secretary would determine whether there is sufficient evidence to warrant a prohibition on the entry of certain goods as required by Section 1307.[7]

The Assistant Secretary enclosed a copy of a letter to the Secretary from the Director of the Central Intelligence Agency (CIA) stating that there was insufficient evidence to identify goods produced with forced labor in the Soviet Union or whether any such goods were being imported into the United States. The Assistant Secretary referred to an ongoing inquiry by the International Trade Commission (ITC), and expressed "hope that it will better enable the Secretary to establish a rational basis for making a final determination . . . in this matter." The letter concluded "until such time as additional evidence comes to light . . . I must respectfully decline to act on your petition. . . ." [8]

On January 28, 1985 the Secretary determined that (1) the available evidence, including the ITC report issued December 1984 [9] and further information from the

---

any time that information available reasonably but not conclusively indicates that merchandise within the purview of section 307 is being, or likely to be, imported, he will promptly advise all district directors accordingly and the district directors shall thereupon withhold release of any such merchandise pending instructions from the Commissioner as to whether the merchandise may be released otherwise than for exportation.

(f) If it is determined on the basis of the foregoing that the merchandise is subject to the provisions of the said section 307, the Commissioner of Customs, with the approval of the Secretary of the Treasury, will publish a finding to that effect in a weekly issue of the Customs Bulletin and in the FEDERAL REGISTER.

6. Petition by Rep. Stewart B. McKinney, *et al.* to William von Raab, Commissioner, U.S. Customs Service (May 23, 1984), attached as Exhibit A–1 to the Complaint.

7. Letter from John M. Walker, Jr., Assistant Secretary of the Treasury for Enforcement and Operations, to Rep. Stewart B. McKinney (June 13, 1984), attached as Exhibit B to the Complaint ("Walker Letter").

8. Walker Letter.

9. In its report, *International Practices and Agreements Concerning Compulsory Labor and U.S. Imports of Goods Manufactured by Convict, Forced, or Indentured Labor,* Inv. No. 332–178, Public No. 1630, the ITC noted that of the Russian prison population estimated at 4 million, 1.2 to 1.5 million are believed to be engaged in the manufacture of goods which might enter international commerce and that "imports of such goods from the U.S.S.R. may include products such as various chemicals and related products, metal ores, glassware, miscellaneous metal articles, agricultural equipment, furniture and wood cabinets, electrical equipment and certain petroleum products." U.S.I.T.C. Public. No.

CIA,[10] provides no reasonable basis to establish a nexus between Soviet forced labor practices and specific imports from the Soviet Union, (2) there presently is no basis upon which to prohibit importation into the United States any goods produced within the Soviet Union, and (3) the Commissioner's recommendation of September 1983, was not adopted.[11]

Plaintiffs filed this action September 26, 1984, alleging that the denial of their May 1984 petition constituted final agency action under 5 U.S.C. § 704 (1982) [12] which is arbitrary, capricious, contrary to law, an abuse of discretion, and without observance of procedure required by law under 5 U.S.C. § 706(2)(A), (D) (1982).[13]

Plaintiffs also allege that defendants' failure to deny entry to articles from the Soviet Union which the Commissioner determined in September 1983 may have been made by forced labor was agency action "unlawfully withheld or unreasonably delayed" under 5 U.S.C. § 706(1).

Plaintiffs seek declaratory and injunctive relief.

In December 1984, defendants moved to dismiss the action alleging that plaintiffs lack standing and that the action was not ripe since the Secretary had not made a final determination with respect to the Commissioner's recommendation.

Plaintiffs responded that the action was ripe, saying that "[d]efendants have misperceived the nature of the agency action of which plaintiffs seek review." [14] Plaintiffs said they challenge the denial of their petition seeking enforcement of the Commissioner's finding and Customs' failure to withhold release of merchandise named in the Commissioner's finding. With respect to this second allegation, plaintiffs say "this case has been ripe since September 1983." [15]

Plaintiffs do not challenge the Secretary's January 1985 determination. Their amended complaint, filed February 19,

---

1630 at ix. The ITC concluded, however, that "U.S. imports of merchandise made wholly or in part of compulsory labor are unknown." *Id.* at 25.

10. On January 17, 1985, the Director of the CIA informed the Secretary that "[d]espite continued monitoring, we are unable to obtain sufficient facts to make a solid case that any particular goods were received from the USSR is produced by convict, forced, or indentured labor." Letter from William J. Casey, Director of Central Intelligence, to Donald T. Regan, Secretary of the Treasury (January 17, 1985) attached as Exhibit 1 to Defendants' Reply to Plaintiffs' Opposition to Defendants' Motion for Judgment on the Pleadings.

11. Memorandum from Donald T. Regan, Secretary of the Treasury, to William von Raab, Commissioner, U.S. Customs Service (January 28, 1985), attached as Exhibit 1 to Defendants' Reply to Plaintiffs' Opposition to Defendants' Motion for Judgment on the Pleadings.

12. 5 U.S.C. § 704 provides for judicial review of "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court."

13. 5 U.S.C. § 706(2)(A), (D) states in part:
 To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

 . . . .
 (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
 (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

 . . . .
 (D) without observance of procedure required by law; . . .

14. Plaintiffs' Memorandum in Opposition to Defendants' Motion for Judgment on the Pleadings, at 34.

15. Plaintiffs' Memorandum in Opposition to Defendants' Motion for Judgment on the Pleadings, at 35.

1985, does not refer to that determination.[16] The Secretary is not named as a defendant in either the original or amended complaint.[17]

Defendants say that the Secretary's January 1985 determination renders the suit moot.

The Court has jurisdiction pursuant to 28 U.S.C. § 1581(i)(3), (4) (1982).[18]

The remaining parts of this opinion discuss the history and purpose of section 307 and the parties' allegations with respect to standing and mootness.

---

16. The amended complaint added as parties Constance Claffey, the International Longshoremen's Association, AFL–CIO, and certain members of Congress, and alleged new grounds for standing by existing plaintiffs.

17. Plaintiffs' petition asks the Commissioner "to enforce 19 U.S.C. § 1307 and the regulations promulgated thereunder...." Petition by Rep. Stewart B. McKinney, et al. to William von Raab, Commissioner, U.S. Customs Service 1 (May 23, 1984), attached as Exhibit A–1 to the Complaint. The amended complaint asks the Court to "[e]njoin and direct the defendants and their agents to detain immediately all those goods from the Soviet Union that are not importable under 19 U.S.C. sec. 1307...." Amended Complaint, Prayer for Relief, ¶ 5. The Court does not construe these allegations to challenge the Secretary's January 1985 determination.

18. The parties did not brief, and the Court does not decide, whether the denial of the petition is "committed to agency discretion" within 5 U.S.C. § 701(a)(2) (1982) and therefore precluded from judicial review. *See Heckler v. Chaney*, —— U.S. ——, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) (an agency's decision not to take enforcement action is presumptively immune from judicial review under 5 U.S.C. § 701(a)(2)).

19. Section 307 provides:
All goods, wares, articles, and merchandise mined, produced, or manufactured wholly or in part in any foreign country by convict labor or/and forced labor or/and indentured labor under penal sanctions shall not be entitled to entry at any of the ports of the United States, and the importation thereof is hereby prohibited, and the Secretary of the Treasury is authorized and directed to prescribe such regulations as may be necessary for the en-

## II.

Section 307 [19] was preceded by section 51 of the Tariff Act of 1890, ch. 1244, 26 Stat. 567, 624 (1890), which was intended to protect domestic labor from manufactured goods produced by foreign convict labor.[20] Amendment was sought to expand the prohibition to include products which were mined as well as manufactured.[21] A Senate amendment was offered to extend the provisions to include goods produced by "forced labor or/and indentured labor." Since some members of Congress expressed fear that the humanitarian aims of the amendment [22] might harm the American consumer and fail to protect American

---

forcement of this provision. The provisions of this section relating to goods, wares, articles, and merchandise mined, produced, or manufactured by forced labor or/and indentured labor, shall take effect on January 1, 1932; but in no case shall such provisions be applicable to goods, wares, articles or merchandise so mined, produced, or manufactured which are not mined, produced, or manufactured in such quantities in the United States as to meet the consumptive demands of the United States.
"Forced labor", as herein used, shall mean all work or service which is exacted from any person under the menace of any penalty for its nonperformance and for which the worker does not offer himself voluntarily.
Plaintiffs' allege only that the goods are produced "with the use of convict, forced, or indentured labor." Amended Complaint, ¶ 1. Except where indicated, the Court draws no distinction between goods produced by "convict labor" and "forced or/and indentured labor" for the purposes of this motion.

20. Representative McKinley, sponsor of the Tariff Act of 1890, stated:
[T]he free labor of this country should be saved from the convict labor of other countries, as it has been from the convict labor of our own States and so recommend this provision. It will be of small account to protect our workmen against our own convict labor and still admit the convict-made products of the world to free competition with our free labor.
1890 Congressional Record, p. 4247.

21. Senate Report No. 37, p. 60 (Sept. 4, 1929); Senate Finance Committee Hearings on the Tariff Act of 1930, H.R. 2667, vol. XVII, pp. 307–12.

22. Senator Blaine stated:

labor,[23] the conference committee on the 1930 Tariff Act added a caveat that the statute would not apply to goods produced by "forced labor or/and indentured labor" which were not produced "in such quantities in the United States as to meet the consumptive demands of the United States." [24]

Congress intended to protect domestic workers and producers from unfair competition. But this concern as well as any desire to improve foreign labor conditions were clearly subordinate in section 307, as enacted, to concern for the American consumer's access to merchandise not produced domestically in quantities sufficient to satisfy consumer demand.

It is apparent from the statute that importation of a product produced with "forced labor or/and indentured labor" is permissible when United States production is insufficient to satisfy all domestic demand.[25] Even if the product is produced in the United States in quantities sufficient to meet most of the domestic consumptive demand for that product, such goods may be imported in any quantity and may not be prevented from entering the United States even if the product is available from a country where it is produced by non-forced labor.

## III.

Plaintiffs allege standing under 28 U.S.C. § 2631(i)[26] and 5 U.S.C. § 702 (1982).[27]

The constitutional restriction which limits federal jurisdiction to cases and controversies requires that "the plaintiff must show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979). "The necessity that the plaintiff who seeks to invoke judicial power stand to profit in some personal interest remains an Art. III requirement." *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 39, 96 S.Ct. 1917, 1925, 48 L.Ed.2d 450 (1976).

---

> I propose the amendment to the end that America shall not give aid or comfort to those employers and planters in foreign countries whose forced and indentured labor is brought to poverty and degeneration, with the attendant inhuman treatment of the native workers....
>
> ....
>
> But, aside from that, American agriculture and the American worker, from the standpoint of our economic security, should not be placed in competition with forced and indentured labor, wherever it may be found.
> 1929 Congressional Record, p. 4488.

**23.** Senator Reed stated:
> Will it benefit Americans to exclude from importation into this country products which we do not make and can not make, such as tea, and coffee and rubber? Will it help Americans for us in our zeal to abolish forced labor in foreign climes, to deny to all Americans the use of such articles ...?
> 1929 Congressional Record, p. 4494.

**24.** *See* House Report No. 1326, Conference Report to accompany H.R. 2667, pp. 29 and 105 (April 28, 1930).

**25.** The Court does not decide whether importation of a product produced with "convict labor" is permissible when domestic production is insufficient to satisfy domestic demand. *See* footnote 19, *supra*.

**26.** 28 U.S.C. § 2631(i) states:
> Any civil action of which the Court of International Trade has jurisdiction, other than an action specified in subsections (a)–(h) of this section, may be commenced in the court by any person adversely affected or aggrieved by agency action within the meaning of section 702 of title 5.

**27.** 5 U.S.C. § 702 states in part:
> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof....

Paragraph twenty-four of the amended complaint states that plaintiffs may initiate and seek enforcement of section 307 under 19 C.F.R. § 12.42(b) which provides that "[a]ny person outside the Customs Service" who believes that forced labor goods are being imported into the United States and the United States production of the same class of merchandise meets domestic demand "may communicate his belief to any district director or the Commissioner of Customs." The procedure promulgated by a regulation for informing Customs of possible violations of section 307 cannot expand or otherwise affect the class of individuals who are entitled to judicial review.

■ When the standing of a party is challenged, the question is not whether the issue raised by the plaintiff is justiciable, but whether the plaintiff may properly request an adjudication of that issue. *Flast v. Cohen,* 392 U.S. 83, 99–100, 88 S.Ct. 1942, 1952–53, 20 L.Ed.2d 947 (1968). In *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), the Supreme Court explained:

> The requirement that a party seeking review must allege facts showing that he is himself adversely affected does not insulate executive action from judicial review, nor does it prevent any public interests from being protected through the judicial process. It does serve as at least a rough attempt to put the decision as to whether review will be sought in the hands of those who have a direct stake in the outcome. That goal would be undermined were we to construe [5 U.S.C. § 702] to authorize judicial review at the behest of organizations or individuals who seek to do no more than vindicate their own value preferences through the judicial process.

405 U.S. at 740, 92 S.Ct. at 1368 (footnotes omitted).

The dimensions of the "actual injury" requirement were discussed at length by the Supreme Court in *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). In *Valley Forge,* the Court held that plaintiffs claimed nothing more than "a right to a particular kind of Government conduct":

> They fail to identify any personal injury suffered by them *as a consequence* of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees. That is not an injury sufficient to confer standing under Art. III, ... [S]tanding is not measured by the intensity of the litigant's interest or the fervor of his advocacy. "[T]hat concrete adverseness which sharpens the presentation of is-

sues," *Baker v. Carr,* 369 U.S. [186] at 204 [82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962) ], is the anticipated consequence of proceedings commenced by one who has been injured in fact; it is not a permissible substitute for the showing of injury itself.

454 U.S. at 485–86, 102 S.Ct. at 765–66 (emphasis in original) (footnote omitted).

In determining standing, the Court is also guided by certain prudential limitations which affect plaintiffs' right to seek adjudication of their claims. These were summarized in *Valley Forge:*

> Beyond the constitutional requirements, the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing. Thus, this Court has held that "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin,* 422 U.S. [490] at 499 [95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) ]. In addition, even when the plaintiff has alleged redressable injury sufficient to meet the requirements of Art. III, the Court has refrained from adjudicating "abstract questions of wide public significance" which amount to "generalized grievances," pervasively shared and most appropriately addressed in the representative branches. *Id.,* at 499–500 [95 S.Ct. at 2205]. Finally, the Court has required that the plaintiff's complaint fall within "the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Service Orgs. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970).

454 U.S. at 474–75, 102 S.Ct. at 759–60 (footnotes omitted).

With these considerations in mind, the Court's primary task is to determine whether any plaintiff has alleged "a distinct and palpable injury to himself" as a result of the challenged agency action. *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).

## A. Consumers

■ Most plaintiffs claim standing as consumers, alleging they are adversely affected by the possibility of purchasing goods produced by forced labor in the Soviet Union. Plaintiffs, who understandably do not wish to subsidize Soviet human rights violations, contend that the failure to preclude these products from entry makes it impossible for them to avoid the products.

Plaintiffs attempt to equate their alleged injury to those which gave consumers standing in other contexts. Unlike those consumer litigants, plaintiffs do not allege health or safety injury or an impairment of their ability to conduct informational activities.[28] As pointed out in their brief, plaintiffs allege injury to a "moral and legal right to boycott or avoid the purchase of [forced labor] goods." Although the Court does not question plaintiffs' moral interest in avoiding Soviet forced labor goods, the Court does not find that Congress in enacting section 307 intended that interest to be legally enforceable.

That section 307 does not give consumers an enforceable interest in *avoiding* forced labor goods is apparent from the fact that section 307 was designed to ensure the *availability* of such goods whenever domestic production fails to meet consumer demand. The statute emphasizes the access of goods to consumers over the interests of producers and workers whenever consumer demand cannot be satisfied domestically.[29]

Since section 307 does not provide a legally cognizable interest to consumers to prevent the entry of forced labor goods, their grievances do not rise to the level of actual injury within the meaning of 5 U.S.C. § 702.[30] *See Association of Data Processing Service Organizations v. Camp,* 397 U.S. 150, 153–55, 90 S.Ct. 827, 829–31, 25 L.Ed.2d 184 (1970); *cf. Valley Forge,* 454 U.S. at 485, 102 S.Ct. at 765; *Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 220–23, 94 S.Ct. 2925, 2931–33, 41 L.Ed.2d 706 (1974); *United States v. Richardson,* 418 U.S. 166, 176–80, 94 S.Ct. 2940, 2946–48, 41 L.Ed.2d 678 (1974).

**28.** In *Public Citizen v. Foreman,* 631 F.2d 969 (D.C.Cir.1980), and *Cutler v. Kennedy,* 475 F.Supp. 838 (D.D.C.1979), consumers alleged injuries under the Federal Food, Drug and Cosmetic Act (FDCA). The *Public Citizen* plaintiffs had standing to seek a declaratory judgment that nitrates used in curing bacon are an unsafe food additive under the FDCA. In *Cutler,* consumers of certain drugs had standing to challenge Food and Drug Administration (FDA) regulations pursuant to the FDCA for policing the the over-the-counter drug market. In that case the Court held that plaintiffs had alleged injury to a statutorily protected interest, since the FDCA is "a scheme whose principal beneficiaries are obviously the nation's drug consumers." 475 F.Supp. at 848.

In *Natural Resources Defense Council, Inc. v. SEC,* 606 F.2d 1031 (D.C.Cir.1979), "organizations dedicated to inducing more responsive attitudes among American corporations towards the problems of environmental degradation and inequality of employment opportunity" had standing to contest the failure of the SEC "to promulgate rules requiring comprehensive disclosures by corporations of their environmental and equal employment policies." 606 F.2d at 1036. The Court stated: "Their interest was judicially cognizable, personal to them, and was arguably impaired by the lack of equal employment or environmental information.... Moreover, we have no doubt that these appellees, as corporate shareholders concerned about environmental quality, are within the broad zones of interest of both NEPA and the securities acts." *Id.* at 1042–43 (footnotes omitted).

**29.** The Court does not decide whether importation of a product made by "convict labor" is permissible when domestic production is insufficient to satisfy domestic demand. *See* footnotes 19, 25, *supra.* Assuming, *arguendo,* "convict labor" goods are barred from entry even if domestic production is insufficient, consumers would not have an interest in excluding these goods, since the purpose of this prohibition was to protect domestic labor. *See supra* note 20 and accompanying text.

**30.** Plaintiffs cite two opinions of this Court, *Luggage and Leather Goods Mfrs. of Am., Inc. v. United States,* 7 C.I.T. ——, 588 F.Supp. 1413 (1984) and *United States Cane Sugar Refiners' Ass'n v. Block,* 3 C.I.T. 196, 544 F.Supp. 883, *aff'd,* 683 F.2d 399 (1982) in support of their standing as consumers. These cases are inapposite. Neither case involved plaintiffs who alleged standing as consumers, and the Court held in both instances that the plaintiffs alleged direct economic injuries as a result of the challenged actions.

## B. Ukrainian-American Organizations

 The Ukrainian Congress Committee of America, Inc. (UCCA) is a non-profit corporation claiming to represent more than 100 Ukrainian-American organizations. The Ukrainian Student Association of Michnowski (TSUM) is comprised of college students in the United States and Canada. The amended complaint states:

> These Ukrainian organizations and their members object to and are also adversely affected by the continued importation of Soviet slave-made goods as are the other plaintiffs. In addition, the Ukrainian plaintiffs are particularly injured in that a large portion of the political prisoners in labor camps in the Soviet Union are from the Ukraine.[31]

Plaintiffs' objections to forced labor in the Soviet Union are laudable, and undoubtedly many Ukrainians, with whom plaintiffs share a common heritage, suffer from forced labor conditions. However, plaintiffs have not alleged the direct harm to which they themselves must be exposed for standing purposes. *See United States v. SCRAP*, 412 U.S. 669, 687, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254 (1973); *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 166, 92 S.Ct. 1965, 1968, 32 L.Ed.2d 627 (1972).

 The UCCA and the TSUM, having failed to demonstrate their own standing or that of their members, may not assert the rights of Ukrainian laborers. *Cf. Carey v. Population Services International,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977); *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976).

## C. Shareholders

 Plaintiffs Constance Claffey, the Washington Legal Foundation (WLF) and "[m]any of the Congressional plaintiffs," allege standing because they own stock in companies that manufacture or produce goods that compete with Soviet products made with forced labor. Plaintiffs assert that the value of their stock has decreased because competition from forced labor products has decreased sales of these companies.

The injury alleged by shareholders is "the indirect harm which may result to every stockholder from harm to the corporation." *Pittsburgh & West Virginia Railway v. United States,* 281 U.S. 479, 487, 50 S.Ct. 378, 381, 74 L.Ed. 980 (1930).

As was made clear in *Vincel v. White Motor Corp.,* 521 F.2d 1113, 1118 (2d Cir. 1975):

> [W]here an injury is suffered by a corporation and the shareholders suffer solely through depreciation in the value of their stock, only the corporation itself, its receiver, if one has been appointed, or a stockholder suing derivatively in the name of the corporation may maintain an action against the wrongdoer.

*Accord Schaffer v. Universal Rundle Corp.,* 397 F.2d 893, 896 (5th Cir.1968); *Walker Distributing Co. v. Lucky Lager Brewing Co.,* 323 F.2d 1, 10 (9th Cir.1963), *cert. denied,* 385 U.S. 976, 87 S.Ct. 507, 17 L.Ed.2d 438 (1966).

Plaintiffs have no standing as shareholders.

## D. International Longshoremen's Association

The International Longshoremen's Association, AFL–CIO (ILA), claims to represent nearly all employees engaged in loading and unloading ocean-borne cargo on the East and Gulf Coasts of the United States.

 The ILA alleges that it has standing on behalf of itself and its members because they are forced to handle "Soviet slave-made" goods against their will. The Court finds that section 307 does not create in the ILA an enforceable moral interest to challenge the agency action.[32]

 The ILA also argues that it will be subjected to costly lawsuits and employment losses by refusing to handle Soviet cargo. This allegation does not afford

---

**31.** Amended Complaint, ¶ 7.

**32.** *See* Part III A., *supra.*

standing.[33] In effect, the ILA seeks to have this Court find that the Article III injury requirement is satisfied by the adverse consequences which result from conduct which the Supreme Court held violated the National Labor Relations Act (NLRA).[34]

Neither the risk of employment losses and civil lawsuits nor the possibility of reducing potential civil penalties gives the ILA standing to contest the agency action. Such damages would result from activity in which the ILA is prohibited from engaging. Moreover, [s]uch an abstract or speculative injury is insufficient to satisfy the required injury in fact." *Rohm & Hass Co. v. International Trade Commission*, 64 CCPA 170, 173, 554 F.2d 462, 464 (1977).

■ The ILA also claims that the handling of goods prohibited under 18 U.S.C. § 1761 (1982)[35] may subject them to criminal prosecution. Although the threat of prosecution is sufficient to confer standing to challenge the constitutionality of a criminal statute, *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), plaintiffs do not challenge the constitutionality of section 1761.

Nor do plaintiffs explain how prosecution under section 1761 will result from their handling of goods which were not denied entry under section 307. The prosecution of the ILA or its members for unloading ocean-borne cargos from the Soviet Union "takes us into area of pure speculation and conjecture." *Rohm & Haas Co.*, 64 CCPA at 173, 554 F.2d at 464. Such injury is clearly conjectural or hypothetical. *See O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974). The Supreme Court explained in *United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973):

Of course, pleadings must be something more than an ingenious academic exercise in the conceivable. A plaintiff must allege that he has been or will in fact be perceptibly harmed by the challenged agency action, not that he can imagine circumstances in which he could be affected by the agency's action.

412 U.S. at 688–89, 93 S.Ct. at 2416.

It is difficult to conceive of a situation more hypothetical than the potential prosecution of the ILA or its members as a result of the challenged agency action: (1) section 1761 imposes penalties only upon persons who "knowingly" transport convict or prisoner made goods, 18 U.S.C. § 1761(a); (2) goods made with convict or prisoner labor must be labeled as such, 18 U.S.C. § 1762 (1982); (3) the Secretary, the ITC, and the CIA found that there is insufficient information to determine that these products were produced by forced labor;[36] and (4) prosecution would be in the face of

---

**33.** The complaint states that the ILA has been subjected to lawsuits under the secondary boycott provisions of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(b)(4) (1982), as a result of past refusals to handle Soviet cargo. Section 158(b)(4) in essence provides that it is an unfair labor practice for any labor organization to encourage work stoppages in order to force anyone engaged in commerce to cease doing business with another.

**34.** In *International Longshoremen's Ass'n, AFL-CIO v. Allied Int'l, Inc.*, 456 U.S. 212, 102 S.Ct. 1656, 72 L.Ed.2d 21 (1982), the Supreme Court found that a refusal to handle Soviet cargoes was illegal under the NLRA:

As understandable and even commendable as the ILA's objectives may be, the certain effect of its action is to impose a heavy burden on neutral employers. And it is just such a burden, as well as widening of industrial strife, that the secondary boycott provisions were designed to prevent.
456 U.S. at 223, 102 S.Ct. at 1663 (footnotes omitted).

**35.** 18 U.S.C. § 1761 provides in part:

(a) Whoever knowingly transports in interstate commerce or from any foreign country into the United States any goods, wares, or merchandise manufactured, produced, or mined, wholly or in part by convicts or prisoners, ... shall be fined not more than $1,000 or imprisoned not more than one year, or both.
Section 1761 applies only to goods made with convict or prisoner labor, and does not prohibit the transportation of goods made with forced or indentured labor.

**36.** *See supra* notes 9 & 10 and accompanying text.

the Supreme Court's holding that the ILA's refusal to handle goods from the Soviet Union violates 29 U.S.C. § 158.[37]

▆▆▆▆ Finally, the ILA alleges that it and its members have an interest in protecting non-ILA workers in competition with Soviet forced labor. This desire does not satisfy standing requirements, since an organization does not have standing to assert the rights of non-members. *See Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979); *Minority Police Officers Association of South Bend v. City of South Bend, Indiana,* 721 F.2d 197, 202 (7th Cir. 1983).

### E. Public Interest Organizations

The WLF is a nonprofit public interest law firm claiming to have 200,000 members and supporters nationwide. In addition to its consumer and shareholder standing arguments, the WLF asserts standing on two other bases.

▆▆▆▆ First, the WLF contends that it has standing in its own right because agency action has forced it to conduct research activities at its own expense to inform its members and clients of the nature and extent of the importation of Soviet forced labor goods. The Court finds that neither such undertakings nor any attendant expenses constitute injury resulting from the agency action. No case known to the Court has conferred standing on an orga-

nization for incurring expenses of this kind.[38] "[A]n organization's abstract concern with a subject that could be affected by adjudication does not substitute for the concrete injury required by Article III." *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 40, 96 S.Ct. 1917, 1925, 48 L.Ed.2d 450 (1976).

Second, the WLF alleges that manufacturers and producers that are injured by competition with Soviet forced labor goods are represented among its members and supporters.

▆▆▆▆ An organization which cannot show concrete injury to itself, may obtain standing in an associational capacity, when it is acting as the representative of individuals who have standing under Article III. The standing rules applicable to organizations are summarized in *Hunt v. Washington Apple Advertising Commission,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977):

> [a]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

432 U.S. at 343, 97 S.Ct. at 2441.

▆▆▆▆ The WLF has not satisfied the requirement recognized in *Hunt* that the in-

---

**37.** *See* footnote 34, *supra.*

**38.** Cases cited by plaintiff are inapposite. For example, in *Pacific Legal Foundation v. Goyan,* 664 F.2d 1221 (4th Cir.1981), the Court held that a nonprofit corporation, which had established an "institutional presence" in FDA proceedings, had standing to contest proposed FDA regulations which would have increased the number of proceedings in which the plaintiff would participate. Based upon plaintiff's demonstrated involvement in proceedings of the FDA, the Court found that plaintiff had alleged "direct injury" under the proposed rule, the purpose and effect of which was to create additional FDA proceedings. But the WLF has not directly incurred expenses of the kind incurred by a participant in agency proceedings as a result of the rule establishing those proceedings.

The injury alleged in *Scientists Institute for Public Information, Inc. v. Atomic Energy Com-*

*mission,* 481 F.2d 1079, (D.C.Cir.1973) may also be distinguished from that advanced by the WLF. In *Scientists,* an organization involved in making scientific information available to the public sought a declaratory judgment that the Atomic Energy Commission (AEC) was required to issue a detailed statement regarding its "liquid metal fast breeder reactor program" under the National Environmental Policy Act. The court held that injury was alleged, since "[t]he AEC's decision not to provide an impact statement on the overall LMFBR program has an adverse affect on these organizational activities to provide public information on the LMFBR program." 481 F.2d at 1087 n. 29. In contrast, the decision not to prevent the importation of Soviet goods has not impaired the WLF's ability to carry out its informational activities.

terests sought to be protected be germane to the organization's purpose.[39] In *Hunt,* the Washington State Apple Advertising Commission brought suit challenging a North Carolina Agricultural regulation. The Court held plaintiff had standing because it "serves a specialized segment of the State's economic community which is the primary beneficiary of its activities, including the prosecution of this kind of litigation." *Id.* at 344, 97 S.Ct. at 2442.

The WLF in the complaint does not allege any nexus between its organizational purpose and the interests of producers and workers who produce goods which compete with forced labor products.[40]

The allegation that workers and producers are included among the WLF's "members and supporters" does not supply the necessary nexus between the organizational purpose and the interests sought to be represented. The Court does not interpret the rule that "an association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action," *Warth,* 422 U.S. at 511, 95 S.Ct. at 2211, to mean that any rights of an individual may be asserted by any organization to which he belongs regardless of the relationship between that organization and the injury alleged. Since the complaint does not allege that the WLF serves the specialized interest of those affected by the contested agency action, the WLF lacks standing to assert the rights of its members. *See Hunt,* 432 U.S. at 343, 97 S.Ct. at 2441.

■■■ The Union Mutual Foundation and the Constitutional Institute of America also lack standing. Although both claim that they engage in activities to promote the welfare of the American worker, neither allege that it has been injured by the agency action. Furthermore, neither may obtain standing in a representative capacity, since the complaint does not allege that their "members would otherwise have standing in their own right." *Hunt,* 432 U.S. at 343, 97 S.Ct. at 2441.

### F. Members of Congress

Thirty-four present or former members of the United States House of Representatives and two United States Senators allege they have standing in their representative, legislative, and personal capacities.

■■■ A legislator may have standing when the allegedly unlawful conduct has affected the nullification of his vote. *See Coleman v. Miller,* 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939); *Vander Jagt v. O'Neill,* 699 F.2d 1166 (D.C.Cir.1982) *cert. denied,* — U.S. ——, 104 S.Ct. 91, 78 L.Ed.2d 98 (1983); *Reuss v. Balles,* 584 F.2d 461, 467 (D.C.Cir.1978), *cert. denied,* 439 U.S. 997, 99 S.Ct. 598, 58 L.Ed.2d 670 (1978); *Kennedy v. Sampson,* 511 F.2d 430 (D.C.Cir.1974).

But, status as a member of Congress does not eliminate the constitutional requirement that a plaintiff must show actual or threatened injury as a result of the allegedly unlawful conduct of the defendant and that such injury was caused by the challenged action and is likely to be redressed by a favorable decision.

"Once a bill becomes law, a Congressman's interest in its enforcement is shared

---

**39.** The Court makes no finding regarding the requirement in *Hunt* that the organization allege that "its members would otherwise have standing to sue in their own right." The allegation that "members and supporters" of the WLF include individuals engaged in competition "with those goods or products being imported unlawfully from the Soviet Union," would not afford standing absent further particularization. *See Warth,* 422 U.S. at 501–02, 95 S.Ct. at 2206–07; *Carson v. Pierce,* 719 F.2d 931, 933–34 (8th Cir.1983), *reh'g denied,* 726 F.2d 411 (1984).

**40.** The amended complaint states:

> The Washington Legal Foundation is a nonprofit public interest law firm with 200,000 members and supporters nationwide who are similarly adversely affected by the continued illegal importation of Soviet goods made by forced and slave labor....
>
> ....
>
> In addition, WLF's members and supporters include manufacturers or producers of products which are similar to and compete with those goods or products being imported unlawfully from the Soviet Union....

Amended Complaint, ¶ 4, 4(a).

by, and indistinguishable from, that of any other member of the public." *Daughtrey v. Carter*, 584 F.2d 1050, 1057 (D.C.Cir. 1978); *see Harrington v. Schlesinger*, 528 F.2d 455, 459 (4th Cir.1975). Any illegality occurring after the enactment of legislation neither diminishes the effect of plaintiffs' votes nor affects the legal status of the legislation. *Daughtrey*, 584 F.2d at 1057; *Harrington v. Bush*, 553 F.2d 190, 213 (D.C.Cir.1977).

▪ Congressional plaintiffs have not alleged nullification of their votes as a result of the allegedly illegal conduct, and thus have not suffered the judicially cognizable injury necessary to give them standing as legislators.

▪ Congressional plaintiffs allege further that they have standing in a representative capacity because their constituents include consumers of Soviet forced labor goods and workers and producers in industries which compete with such goods. Plaintiffs cannot predicate their own standing upon injuries incurred by their constituents. Generally, plaintiffs must assert their rights and not those of third parties.[41] *Phillips Petroleum Co. v. Shutts*, — U.S. —, —, 105 S.Ct. 2965, 2971, 86 L.Ed.2d 628 (1985); *Valley Forge*, 454 U.S. at 474, 102 S.Ct. at 759; *Warth*, 422 U.S. at 499, 95 S.Ct. at 2205.

One further ground on which congressional plaintiffs may assert standing could possibly be fathomed from the following allegation:

> As consumers, workers, and producers of the relevant products, congressional plaintiffs and their constituents are adversely affected by the continued illegal importation of goods from the Soviet Union goods made by forced or convict labor.[42]

Because of the ambiguity of this allegation, it is not clear whether the terms "workers and producers" apply only to plaintiffs' constituents or to congressional plaintiffs as well.

The Supreme Court has explained:

> For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.

*Warth*, 422 U.S. at 501, 95 S.Ct. at 2206 (citing *Jenkins v. McKeithen*, 395 U.S. 411, 421–22, 89 S.Ct. 1843, 1848–49, 23 L.Ed.2d 404 (1969)). Applying this principle, the complaint could be construed to allege that individual members of Congress are workers and producers adversely affected by the importation of forced labor goods.

▪ When the allegations which might provide standing are in need of elaboration, the Court may require or allow plaintiffs to provide information to assist the Court in ruling on standing:

> it is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing. If, after this opportunity, the plaintiff's standing does not adequately appear from all materials of record, the complaint must be dismissed.

*Warth*, 422 U.S. at 501–02, 95 S.Ct. at 2206–07.

Before the Court would grant standing to individual congressional plaintiffs as workers and producers, the Court would require the names of the plaintiffs who are workers and producers in the relevant industries, identification of the products produced, and information regarding whether those products compete with Soviet forced labor products.

To conclude, the Court finds that standing is denied as to all plaintiffs with the

---

**41.** The rights of third parties will not provide standing to a plaintiff. Once a plaintiff has established standing in his own right, the interests of third parties may be argued by the plaintiff. *See Carey v. Population Services International*, 431 U.S. 678, 682–84, 97 S.Ct. 2010, 2014–15, 52 L.Ed.2d 675 (1977); *Craig v. Boren*, 429 U.S. 190, 192–97, 97 S.Ct. 451, 454–57, 50 L.Ed.2d 397 (1976).

**42.** Amended Complaint, ¶ 3.

exception of congressional plaintiffs suing in their individual capacities as workers and producers. The Court makes no finding with respect to those plaintiffs and the action on this record cannot be dismissed on grounds of standing. The Court will consider defendants' allegations that the action is moot.

### IV.

 The constitutional limitation of the federal judicial power to cases and controversies requires dismissal of an action as moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491 (1969).

 The Secretary's decision in January 1985, that there was no basis to prohibit the entry of Soviet goods under section 307 renders this action moot.

Plaintiffs seek a declaratory judgment that the Commissioner made a finding in September 1983, pursuant to 19 C.F.R. § 12.42(e). Plaintiffs also seek an injunction barring from entry imports from the Soviet Union covered by that finding. Plaintiffs argue that the Commissioner had a non-discretionary duty under 19 C.F.R. § 12.42(e) to advise district directors of his finding, and that the district directors were required to withhold from release the described merchandise pending further instructions from the Commissioner. The complaint also challenges the denial of the May 1984, petition, which asked the Commissioner to enforce his September 1983 finding.

· The Commissioner's 1983 finding has now been supersede by the Secretary's final determination. The Secretary's determination renders moot all issues concerning the Commissioner's finding. The relief sought by the petition, and thus the relief sought by this action challenging the denial of the petition, is no longer viable. The Court can hardly require district directors to hold at the ports goods which the Secretary has determined are not subject to the prohibition of section 307.

Since there no longer exists a live dispute with respect to whether or how the Commissioner's finding should have been implemented, any decision by the Court as to whether the Commissioner made a finding under section 12.42(e), or the consequences of such a finding, would be "gratuitous and thus inconsistent with the Art. III limitation." *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976).

### V.

Plaintiffs challenge defendants' failure to implement the Commissioner's September 1983 finding that certain products from the Soviet Union may be produced by forced labor. The Court holds that: all plaintiffs lack standing except congressional plaintiffs in their personal capacity as workers and producers in industries competing with Soviet forced labor goods; these allegations of Congressional plaintiffs would require further particularization; and that the Court does not require further particularization since the Secretary's January 1985 determination renders the Commissioner's finding moot.

The action is dismissed. Judgment will enter accordingly. So ordered.