**Representative Stewart B. McKINNEY, et al.,\* Appellants,**

**v.**

**UNITED STATES DEPARTMENT OF the TREASURY; John M. Walker, Jr., Assistant Secretary of the Treasury (Enforcement and Operations); United States Customs Service; and William Von Raab, Commissioner of Customs, Appellees.**

**Appeal No. 85–2806.**

United States Court of Appeals, Federal Circuit.

Aug. 8, 1986.

---

\* Appellants are individually listed in the Appendix.

Paul D. Kamenar, Washington Legal Foundation, Washington, D.C., argued for appellants. With him on brief was Daniel J. Pepeo.

David M. Cohen, Director, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for appellees. With him on brief were Richard K. Willard, Asst. Atty. Gen. and Velta A. Melnbrencis. Terry Thiele, Atty.-Advisor, Office of General Counsel, Dept. of the Treasury, of counsel.

Before BISSELL and ARCHER, Circuit Judges, and RE, Chief Judge.[**]

ARCHER, Circuit Judge.

Appellants appeal from the judgment entered in *Representative Stewart B. McKinney, et al. v. United States Department of the Treasury, et al.*, 614 F.Supp. 1226 (Ct. Int'l Trade 1985),[1] wherein Judge Dominick L. DiCarlo of the Court of International Trade dismissed appellants' complaint for lack of standing and mootness. We affirm on the basis of lack of standing.

*Background*

Section 307 of the Tariff Act of 1930, as amended,[2] provides that:

All goods, wares, articles, and merchandise mined, produced, or manufactured wholly or in part in any foreign country by convict labor or/and forced labor or/and indentured labor under penal sanctions shall not be entitled to entry at any of the ports of the United States, and the importation thereof is hereby prohibited, and the Secretary of the Treasury is authorized and directed to prescribe such regulations as may be necessary for the enforcement of this provision. The provisions of this section relating to goods, wares, articles, and merchandise mined, produced, or manufactured by forced labor or/and indentured labor, shall take effect on January 1, 1932; but in no case shall such provisions be applicable to goods, wares, articles, or merchandise so mined, produced, or manufactured which are not mined, produced, or manufactured in such quantities in the United States as to meet the consumptive demands of the United States.

"Forced labor", as herein used, shall mean all work or service which is exacted from any person under the menace of any penalty for its nonperformance and for which the worker does not offer himself voluntarily.

The United States Department of State, in February 1983, furnished the Congress with a report entitled "Report on Forced Labor in the U.S.S.R." Accompanying this report was a letter of the Undersecretary of State for Political Affairs which stated that forced labor[3] was used to produce large amounts of primary and manufactured Soviet goods for both domestic and export markets.[4]

In September 1983, the Commissioner of Customs sought approval from the Secretary of the Treasury to publish[5] in the

[**] The Honorable Edward D. Re, Chief Judge, United States Court of International Trade, sitting by designation.

1. 19 Cust. B. & Dec. No. 33, at 57 (August 14, 1985).

2. 19 U.S.C. § 1307 (1982).

3. For purposes of the opinion no distinction is drawn between convict labor, forced labor, or indentured labor, herein referred to as "forced labor." The amended complaint generally uses the term "slave labor."

4. This report and the accompanying letter are reprinted in *Forced Labor in the Soviet Union: Hearing Before the Subcommittee on Human Rights and International Organizations of the House of Representatives Committee on Foreign Affairs and the Commission on Security and Cooperation in Europe*, 98th Cong., 1st Sess. 96–125 (Comm.Print 1983).

5. The proposed publication was entitled "Withholding of Release of Merchandise from Soviet Union Which May be Produced by Convict, Forced, or Indentured Labor." The Commissioner sought to publish these findings as provided by 19 CFR § 12.42(f). Although not explicitly found by the court the Commissioner of Customs appears to have made the necessary condition-precedent findings under 19 CFR § 12.42(e) that "merchandise within the purview of section 307 is being, or is likely to be, imported" from the U.S.S.R. The court opinion indicates only that the Commissioner, citing the State Department report, *see supra* note 4, and congressional and public concern, sought approval from the Secretary of the Treasury to publish a finding pursuant to § 12.42(f). *McKinney*, No. 85–73, slip op. at 58.

Federal Register his findings that certain products from the U.S.S.R. may have been produced by forced labor, which would have the effect of prohibiting the entry of such products into the United States. *See* 19 CFR 12.42(g). In May 1984, the Secretary of the Treasury notified the Commissioner that such a determination was not warranted at that time, but should be deferred pending a study by the International Trade Commission.[6]

Thereafter in May 1984, eighty-four members of Congress and several associations petitioned the United States Customs Service[7] to bar importation of goods produced in the U.S.S.R. wholly or in part by forced labor.[8] The Assistant Secretary for Enforcement and Operations of the Treasury subsequently notified these petitioners that the Department of the Treasury would not act on their petition until such time as additional evidence became available.

In January 1985, the Secretary of the Treasury, on the available evidence,[9] determined that there was no reasonable basis

upon which to establish a nexus between Soviet forced labor practices and specific imports from the U.S.S.R. or to bar importation of any goods produced in the U.S.S.R. In doing so, the Secretary declined to adopt the Commissioner's proposed findings of late 1983.[10]

Appellants filed the present action on September 26, 1984 seeking declaratory and injunctive relief and filed an amended complaint on February 20, 1985. They alleged that the denial of their May 1984 petition constituted a final agency action, 5 U.S.C. § 704 (1982), which was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. 5 U.S.C. § 706(2)(A), (D) (1982). The appellants further alleged that agency action on their petition was unlawfully withheld or unreasonably delayed. 5 U.S.C. § 706(1).

The court concluded that, with the exception of the congressional appellants in their capacities as workers and producers, none of the appellants possessed standing.[11] 614 F.Supp. at 1238–1241.

---

**6.** Memorandum of May 16, 1984, from Donald T. Regan, Secretary of the Treasury, to William Von Raab, Commissioner of Customs, stated in pertinent part that:

> I have decided that no determination of any kind is warranted at this time. As you are aware, the Senate Finance Committee has directed the International Trade Commission to review this matter in depth. I think it necessary, given the current paucity of reliable information, to withhold any determination until we have the benefit of the International Trade Commission's study.

**7.** It appears, on the basis of the May 23, 1984, letter from congressional petitioners to the Commissioner of Customs, that their action was initiated based upon the belief that the Commissioner had already made the necessary finding under 19 CFR § 12.42(e). *See supra* note 5 and accompanying text.

**8.** Based upon information (which may come from a Customs official, from any person, or otherwise be available, 19 CFR § 12.42(a), (b) and (e)), which reasonably, but not conclusively, indicates that goods within the purview of § 307 are being, or are likely to be imported, the Commissioner may make a finding to such effect. 19 CFR § 12.42(e). If the Commissioner makes such a finding, § 12.42(e) directs him to promptly advise district directors of the Customs Service, who shall withhold release of

such goods until further advised by the Commissioner as to their disposition. Since the Commissioner appears to have made a *sua sponte* finding pursuant to § 12.42(e) with respect to certain U.S.S.R. imports, *see supra* note 5 and accompanying text, these petitioners were requesting the Commissioner to carry out his further duty as set forth in § 12.42(e).

**9.** This evidence included the ITC report issued in December 1984, *see supra* note 6, entitled *International Practices and Agreements Concerning Compulsory Labor and U.S. Imports of Goods Manufactured by Convict, Forced, or Indentured Labor*, Inv. No. 332–178, Public. No. 1630, and an informational letter from William J. Casey, Director of the CIA, to Donald T. Regan, Secretary of the Treasury.

**10.** Memorandum of January 28, 1985, from John M. Walker, Jr., Assistant Secretary of the Treasury for Enforcement and Operations, to William von Raab, Commissioner, U.S. Customs Service. See also Letter of February 28, 1985 from John M. Walker, Jr., Assistant Secretary of the Treasury for Enforcement and Operations, to The Honorable Stewart McKinney.

**11.** It has been clarified on brief that the congressional appellants do not claim standing as "workers and producers."

The court also concluded that the action must be dismissed as moot. *Id.* at 1241. It determined that the decision by the Secretary of the Treasury in 1985 superseded the 1983 findings of the Commissioner of Customs, and that the relief sought by appellants—a declaration that the Commissioner made findings pursuant to 37 C.F.R. § 12.42(e), a mandatory injunction implementing these findings in accordance with § 12.42(e), and a determination that the Commissioner improperly denied the appellant's May 1984 petition—was mooted by the Secretary's decision.

On appeal it is argued that all of the appellants in the capacities now asserted have standing, *viz.*, that, either directly or as a representative of their members or constituency, all have suffered injury. As consumers, the injury is that they do not wish to purchase these illegal products and subsidize Soviet human rights violations. They also claim injury "as stockholders in U.S. companies which compete with the illegal imports, as members of the International Longshoremen's Association which are forced to handle these products; as public interest organizations which have a specialized interest in this area; and as Congressmen who are affected by the defendants' actions in their personal, representative and legislative capacities." Appellants also argue that the court committed error in holding that the present case is moot.

## OPINION

### I

■ Fundamentally, the question of standing involves the determination of whether a particular litigant is entitled to invoke the jurisdiction of a federal court to decide the merits of a dispute or of particular issues. *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975). The focus is on the qualifications and status of the party seeking to bring his complaint before a federal court and not on the issues he wishes to have resolved. *Simon v. Eastern Kentucky Welfare Rights*

*Organization,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976).

■ When the standing of a litigant is placed in issue, the court must undertake a two-step analysis which involves both the constitutional limitations and the prudential limitations that circumscribe standing. *Warth,* 422 U.S. at 498, 95 S.Ct. at 2204. As a threshold matter the court must ensure that the litigant satisfies the requirements of Article III of the Constitution. *Simon,* 426 U.S. at 39, 96 S.Ct. at 1924. Once the court determines that the litigant satisfies the constitutional aspects, it must consider whether any prudential limitations restrain the court from exercising its judicial power. *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979).

Article III confines the role of the federal courts to adjudication of actual "cases" and "controversies." *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984); *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 151, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). Standing, in the constitutional dimension, is one of the doctrines that clusters about Article III,[12] to define further the case-or-controversy requirement that limits the federal judicial power in our system of government. *Allen,* 468 U.S. at 750, 104 S.Ct. at 3324. Those who do not possess Article III standing may not litigate in the courts of the United States. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 475–76, 102 S.Ct. 752, 760–61, 70 L.Ed.2d 700 (1982).

■ The principal limitation imposed by Article III is that a litigant seeking to invoke the court's authority must "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Gladstone, Realtors,* 441 U.S. at 98, 99 S.Ct. at 1607; *see also Allen,* 468 U.S. at 751, 104 S.Ct. at 3325; *Valley Forge,* 454

---

**12.** Others include mootness, ripeness, political question and the like.

U.S. at 472, 102 S.Ct. at 758; *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 72, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978); *Warth*, 422 U.S. at 501, 95 S.Ct. at 2206. In addition, Article III requires the litigant to establish that there is a causal connection between the litigant's injury and the putatively illegal conduct of the defendant, and that this injury is likely to be redressed should the court grant the relief requested. *Allen*, 468 U.S. at 751, 104 S.Ct. at 3325; *Valley Forge*, 454 U.S. at 472, 102 S.Ct. at 758; *Simon*, 426 U.S. at 38, 41–42, 96 S.Ct. at 1924, 1925–26.

The nature of the actual or threatened injury that must be established by the litigant has been described by the Supreme Court variously as: a "judicially cognizable" injury, *Allen*, 468 U.S. at 754, 104 S.Ct. at 3326; a "personal" injury, *Valley Forge*, 454 U.S. at 485, 102 S.Ct. at 765; a "distinct and palpable" injury, *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 342, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977); *Warth*, 422 U.S. at 501, 95 S.Ct. at 2206; a "particular concrete" injury, *United States v. Richardson*, 418 U.S. 166, 177, 94 S.Ct. 2940, 2946, 41 L.Ed.2d 678 (1974); a "concrete" injury, *Schlesinger v. Reservist Committee to Stop the War*, 418 U.S. 208, 220, 94 S.Ct. 2925, 2931, 41 L.Ed.2d 706 (1974); or a "specific present objective harm or a threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 14, 92 S.Ct. 2318, 2326, 33 L.Ed.2d 154 (1972). The Court has held that the actual or threatened injury may be either economic or noneconomic in nature. *Sierra Club v. Morton*, 405 U.S. 727, 734, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972).

 But the Court has cautioned that "abstract," "conjectural," or "hypotheti-

cal" injury is insufficient to meet the Article III requirement for injury. *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02, 103 S.Ct. 1660, 1664–65, 75 L.Ed.2d 675 (1983); *see also Allen*, 468 U.S. at 751, 104 S.Ct. at 3325. The mere assertion of a right to have the Government act in accordance with the law is not sufficient, in and of itself, to satisfy the injury requirement. *Allen*, 468 U.S. at 754, 104 S.Ct. at 3326. Nor is an interest in a problem, no matter how longstanding the interest or how qualified the litigant in matters relating to the problem, sufficient to satisfy the injury requirement. *Sierra Club*, 405 U.S. at 739, 92 S.Ct. at 1368.

The Supreme Court has also recognized that an organization may have standing to assert the claims of its members, even where the organization itself has not suffered an injury from the putatively unlawful action. *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 342, 97 S.Ct. 2434, 2440, 53 L.Ed.2d 383 (1977).[13] But this doctrine does not vitiate the injury requirement imposed by Article III, for the organization derives its standing in part by showing that its members have incurred an actual or threatened injury. *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. Brock*, —— U.S. ——, ——, 106 S.Ct. 2523, ——, 91 L.Ed.2d 228 (1986); *Valley Forge*, 454 U.S. at 476 n. 14, 102 S.Ct. at 761 n. 14; *see supra* note 13.

 In addition to the constitutional requirements, the Supreme Court has articulated several prudential limitations that may be relevant in addressing the issue of standing. A litigant must generally assert his own legal rights or interests, and can-

---

**13.** Associational standing requires that the organization show that:

 (1) its members would otherwise have standing to sue in their own right;

 (2) the interests it seeks to protect are germane to the organization's purpose; and

 (3) neither the claims asserted nor the relief requested requires the participation of the individual members in the lawsuit.

432 U.S. at 343, 97 S.Ct. at 2441.

 These principles were recently reaffirmed by the Supreme Court in *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. Brock*, —— U.S. ——, ——, 106 S.Ct. 2523, 2529, 91 L.Ed.2d 228, (1986).

not rest his claim to relief on the legal rights or interests of third parties. *Warth,* 422 U.S. at 499, 95 S.Ct. at 2205. A litigant must assert an injury peculiar to himself or to a distinct group of which he is a part, rather than an interest shared in substantially equal measure by all or a large part of the populace. *Gladstone, Realtors,* 441 U.S. at 100, 99 S.Ct. at 1608. And, the litigant's complaint must fall within the "zone of interests" to be protected or regulated by the statute or constitutional guarantee in question. *Data Processing Service,* 397 U.S. at 153, 90 S.Ct. at 829. *See Valley Forge,* 454 U.S. at 474–75, 102 S.Ct. at 759–60.

## II

Appellants have variously alleged standing as consumers, workers and producers, shareholders, handlers, public interest organizations, and legislators who are adversely affected by the importation of Soviet goods in contravention of § 307. We consider below each of these classes of appellants and their particular claims of

injury as suggested by the Supreme Court in *Allen:*

> Typically ... the standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted.

468 U.S. at 752, 104 S.Ct. at 3325.

### A. Consumers

■ Congressional appellants, in their personal capacities [14] as consumers, have alleged that they are adversely affected by the purchase of, or risk of purchasing, Soviet goods produced by forced labor.[15] The congressional appellants appear to be asserting an alleged Article III injury which they believe reflects both economic injury [16] and non-economic ethical injury.[17] We address both aspects of such alleged injury.

For the purpose of this analysis, it is assumed that the economic detriment alleged is sufficient to satisfy the injury requirement imposed by Article III. We con-

---

**14.** The congressional appellants also contend that, in their representative capacities, they may assert the legal rights or interests of their constituents as consumers. The only precedent cited in support of this proposition is the concurrence of Senior Circuit Judge Fahy in *Kennedy v. Sampson,* 511 F.2d 430, 446 (D.C.Cir.1974). But the majority of the panel in *Kennedy* concluded that Senator Kennedy had standing to maintain his suit in his capacity as an individual United States Senator who had voted in favor of a bill, i.e., standing in his legislative capacity. *Id.* at 433. In his concurrence, Judge Fahy offered the following comments:

> As a United States Senator he represents a sovereign State whose people have a deep interest in the Act and look to their Senators to protect that interest; and he, as Senator, it seems to me, has a legal right not only to seek judicial protection of those interests, ....

*Id.* at 446. The congressional appellants rely upon these statements for the broad proposition that congressmen have standing to assert the legal rights or interests of their constituents in their representative capacities. We disagree. Since the issue in *Kennedy* was whether the Family Practice of Medicine Act had been enacted as law, Judge Fahy's comments can be construed as implying standing to a legislator in his representative capacity only when the case or controversy involves a legislative function or procedure.

**15.** The Washington Legal Foundation (WLF), on behalf of itself, its members and supporters, and Constance Caffey, a member and Executive Director of WLF, assert standing based upon their status as consumers. WLF may assert a claim to relief based upon its alleged rights as a consumer, but may not assert a claim to relief on the basis of third parties, i.e., its supporters. *Valley Forge,* 454 U.S. at 474, 102 S.Ct. at 759; *Warth,* 422 U.S. at 499, 95 S.Ct. at 2205. In light of our conclusion on consumer standing, we need not address the question of whether WLF may assert the claims of its consumer members. *But see infra* Section B.

**16.** The alleged economic injury as consumers appears to be that they are making expenditures for Soviet products which they do not wish to purchase, and that these expenditures subsidize the respective Soviet industries. It is doubtful that either should be classified as an economic injury for there is no suggestion that full economic value has not been obtained from the expenditure. Thus the stated injury seems to fall into the non-economic category. *See infra* note 17.

**17.** The alleged non-economic ethical injury as consumers appears to lie in the trauma induced in appellants by the unwitting purchase of Soviet products produced in contravention of moral and legal principles held by such consumers.

**1552**

clude, however, that this court should refrain from exercising jurisdiction over appellants' complaint as it relates to their status as consumers because of the "zone of interests" prudential limitation.

Section 307 was enacted by Congress to *protect* domestic producers, production, and workers from the unfair competition which would result from the importation of foreign products produced by forced labor. No stated or implied intention is evident in the statute or its legislative history to protect the consuming public from the importation of goods produced by forced labor. Although § 307 also *regulates* the importation of products produced by forced labor, it does so in a manner that will afford domestic consumers a supply of such products through importation when there is insufficient domestic production to satisfy consumer demand. Thus, § 307 only affords consumers a legal right or interest to have access to such products by relaxation of the import ban when they are in short supply domestically. This legal interest, however, is not implicated or asserted by any of the appellants claiming consumer status.

The plain language of § 307, accordingly, will not support an interpretation that it was enacted to afford consumers a legal right or interest in preventing, for economic, moral, or ethical reasons, the importation of foreign goods produced by forced labor.[18] Had Congress intended such protection to flow from § 307, it would likely have imposed an absolute bar, i.e., precluding importation of foreign products found to have been produced by forced labor under all conditions, rather than a conditional exclusion to be lifted in the event of unfulfilled domestic demand. *See McKinney,* 614 F.Supp. at 1236. The nature and character of the legislation does not support the contention that Congress intended to create a statutory privilege accruing to consumers in the avoidance of purchasing imported goods produced through human rights vio-

lations. *Stark v. Wickard,* 321 U.S. 288, 306, 64 S.Ct. 559, 569, 88 L.Ed. 733 (1944). And though we assume there might be an economic injury [19] to consumers sufficient to meet the requirements of Article III, the economic claim asserted by appellants as consumers is not within the "zone of interests" protected or regulated by § 307. *Valley Forge,* 454 U.S. at 474–75, 102 S.Ct. at 759–60.

As to the non-economic injury claimed by appellants as consumers, we do not agree with appellants' assertion that this is the kind of injury that satisfies the Article III requirement. The alleged non-economic injury is founded on the adverse psychological consequences arising from inadvertent support of immoral conduct with which appellants disagree. *Id.* at 485, 102 S.Ct. at 765. The ethical injury asserted by appellants is the type of abstract injury, *Allen,* 468 U.S. at 755–56, 104 S.Ct. at 3327, which would transform the federal courts into nothing more than a vehicle for the vindication of value interests of concerned bystanders, *United States v. SCRAP,* 412 U.S. 669, 687, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254 (1973), and, as such, is not "an injury sufficient to confer standing under Art. III." *Valley Forge,* 454 U.S. at 485, 102 S.Ct. at 765.

Even if this non-economic injury satisfied Article III, prudential limitations counsel against standing for appellants as consumers. In view of the above analysis of economic injury, it is even more unlikely that Congress intended § 307 to shield the psyche of domestic consumers against foreign products produced through human rights violations. Such a conclusion would be anomalous in the face of the exception provided by § 307 for short-supply importation of goods produced by forced labor. Appellants as consumers and their claimed non-economic injury are not within the "zone of interests" protected or regulated by § 307.

18. In statutory interpretation, the language of an enactment will be given its plain meaning unless this reading would lead to a result at variance with the policy of the legislation as a whole. *Trans Alaska Pipeline Rate Cases,* 436 U.S. 631, 643, 98 S.Ct. 2053, 2061, 56 L.Ed.2d 591 (1978).

19. *But see supra* note 16.

Moreover, appellants are also prudentially limited from asserting standing as injured consumers because their injury is not peculiar to a distinct group. *Gladstone, Realtors,* 441 U.S. at 100, 99 S.Ct. at 1608. Appellants have argued to the contrary, claiming that this non-economic injury is specific to them as a group, but other than a generalized, conclusory statement to this effect they have failed to present any persuasive reasons why they should be so considered. The moral and ethical interest in avoiding the purchase of or boycotting foreign goods produced by forced labor is shared by most, if not all, of the domestic populace. This is the type of wide public concern, amounting to a generalized grievance, which federal courts normally refrain from adjudicating. *Warth,* 422 U.S. at 499–500, 95 S.Ct. at 2205–06. Appellants' non-economic injury, therefore, cannot serve as a predicate for standing.

### B. Producers

▮▮▮ The WLF asserts standing on the basis of its members and supporters [20] who include "manufacturers or producers or workers employed by manufacturers or producers of products which are similar to and compete with goods or products being imported unlawfully from the Soviet Union." To rely on derivative or associational standing, the WLF must show that it meets the requirements for standing articulated by the Supreme Court in *Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). *See supra* note 13.

One of the *Hunt* requirements is that an organization must demonstrate that the interests it seeks to protect are germane to the organization's purpose. 432 U.S. at 343, 97 S.Ct. at 2441. The WLF, in the amended complaint, avers that it is a "non-

profit public interest law firm." The amended complaint does not indicate that a purpose of the WLF is to protect the economic interests of producers and workers generally or to protect its producer and worker members adversely affected by goods imported in contravention of § 307. *International Union,* —— U.S. at ——, 106 S.Ct. at 2531. The court concluded, *McKinney,* 614 F.Supp. at 1239, and we agree, that the WLF has failed to demonstrate a nexus between its organizational purpose and the economic interests of the producers and workers it purportedly represents. *International Union,* —— U.S. at ——, 106 S.Ct. at 2531.

Additionally, WLF has failed to show that its producer and worker members have standing to sue in their own right.[21] *International Union,* —— U.S. at ——, 106 S.Ct. at 2529. A certain degree of specificity in delineating the injury, be it "judicially cognizable," *Allen,* 468 U.S. at 754, 104 S.Ct. at 3326, "distinct and palpable," *Hunt,* 432 U.S. at 342, 97 S.Ct. at 2441, or "concrete." *Schlesinger,* 418 U.S. at 220, 94 S.Ct. at 2932, is a prerequisite to Article III standing. WLF, in the amended complaint, has failed to allege sufficient facts to establish an economic injury in fact,[22] leading us to conclude that whatever injury producers and workers may have is, at best, conjectural or speculative. *City of Los Angeles,* 461 U.S. at 101–02, 103 S.Ct. at 1664–65. This is not sufficient to satisfy the injury requirement of Article III.

WLF admits in the amended complaint that Soviet forced labor products are "not readily identifiable," although it does mention four broad categories of such products, *viz.,* wood products, refined oil prod-

---

**20.** *See supra* note 15. The congressional appellants similarly argue that they have a right to sue in their representative capacities on behalf of their constituents who are workers and producers. But, as discussed in note 14 *supra,* the congressional appellants, in their representative capacities, cannot assert a third party's legal right or interest in the enforcement or execution of § 307 inasmuch as this question does not involve a legislative function or procedure.

**21.** *See Hunt,* 432 U.S. at 343, 97 S.Ct. at 2441 ("its members would otherwise have standing to sue in their own right").

**22.** *Valley Forge,* 454 U.S. at 487 n. 23, 102 S.Ct. at 766 ("Respondent is still obligated to allege facts sufficient to establish that one or more of its members has suffered, or is threatened with, an injury....").

ucts, gold ore, and farm machinery.[23] The products set forth in the § 12.42(e) findings of Commissioner of Customs von Raab[24] are likewise not sufficiently specific for the most part to clearly delimit Soviet-made products that would contravene § 307.[25] Even if it is assumed that these products have been satisfactorily identified in the amended complaint,[26] standing for WLF on the basis of its member producers and workers would still have to be denied because the complaint has not "alleged facts sufficient to make out a case or controversy had the members themselves brought suit." *International Union*, — .U.S. at —– —, 106 S.Ct. at 2529–30; 54 U.S.L.W. at 4766–67; *Warth*, 422 U.S. at 516, 95 S.Ct. at 2214. The amended complaint does not identify any individuals, industries, producers, or workers in competition with the Soviet products identified by Commissioner von Raab, nor does the complaint provide any information regarding the nature, circumstances, or basis of the injury.[27] Un-der such circumstances any alleged injury is wholly speculative and conjectural. *City of Los Angeles*, 461 U.S. at 101–02, 103 S.Ct. at 1664–65. In the absence of some reasonable delineation of the injury and that it was caused by identified Soviet goods, we hold that WLF may not claim standing based solely upon the allegation that some of its members may be producers or workers.

## C. Shareholders

 Several of the appellants[28] assert standing on the basis of stock ownership in companies that manufacture or produce goods that compete with the Soviet products allegedly made with forced labor. They argue that an allegation of competitive injury to a corporation in which stock is owned is a sufficient basis for shareholders to have standing and, further, that the extent of the competitive injury need not be substantial.[29]

23. These are the only Soviet products set forth in the amended complaint. The complaint, however, avers that such Soviet products "have been particularly identified by defendant," which we take to mean the § 12.42(e) findings by Commissioner von Raab. *See supra* note 5; *infra* note 25; *but see infra* note 26. For the purpose of analysis we will presume that all of the products identified in the Commissioner's § 12.42(e) findings are intended to be incorporated by reference in the amended complaint.

24. *See supra* note 5; *infra* note 25.

25. Commissioner von Raab identified the Soviets goods as lumber, furniture, clock cases (wood), radio-tv cabinets, chess pieces (wood), wooden souvenirs, wooden crates, cardboard boxes, cathode ray tubes and components, resistors, camera lenses, glassware including chandeliers, auto parts, wheel rims, agricultural parts, gold ores, iron ore and manganese ore, bauxite, uranium ore, lignite coal, asbestos, crushed limestone, construction stone, gravel, ornamented coats (male and female, of various materials), non-ornamented coats, and gloves.

26. This presumption is tenuous at best due to the gross generalizations in categorizing the Soviet goods. That a more precise particularization of goods alleged to be imported in contravention of § 307 may be inherently more difficult in the case of a closed society such as the Soviet Union does not abrogate the requirement

of Article III to allege a judicially cognizable injury. *Valley Forge*, 454 U.S. at 485, 102 S.Ct. at 765. Moreover, the Secretary of the Treasury, in his memorandum of January 28, 1985, to Commissioner von Raab, superseded and, in essence, nullified the Commissioner's § 2.42(e) findings by concluding that "the available evidence provides no reasonable basis in fact to establish a nexus between Soviet forced labor practices, and specific imports from the Soviet Union." *See McKinney*, 614 F.Supp. at 1231 (the Secretary's final determination supersedes the Commissioner's 1983 findings, and renders moot all issues concerning these findings).

27. Relevant information might include one or more of the following: (1) reduction in product pricing; (2) decline in domestic sales; (3) decline in domestic production; (4) drop in producers' share prices; (5) decline in the number of producers; (6) producer bankruptcies; (7) worker layoffs or cutback; or (8) reduction in workers' wages.

28. Constance Claffey, the WLF, and several of the congressional appellants.

29. In support of these propositions appellants have cited: *United States v. SCRAP*, 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 2417 n. 14, 37 L.Ed.2d 254 (1973); *Rental Housing Ass'n of Greater Lynn, Inc. v. Hills*, 548 F.2d 388 (1st Cir.1977).

While allegations showing competitive injury may be appropriate to confer standing in appropriate circumstances, *see, e.g., Arnold Tours, Inc. v. Camp,* 400 U.S. 45, 91 S.Ct. 158, 27 L.Ed.2d 179 (1970), appellants have done nothing more than allege competitive injury in the abstract. Article III requires more specific allegations of competitive injury to satisfy the case or controversy requirement.[30] *See City of Los Angeles,* 461 U.S. at 101–02, 103 S.Ct. at 1664–65. The facts set forth in the complaint must be sufficient for a court to determine, assuming all of the allegations to be true, that a party indeed has suffered, or is likely to suffer, an injury in fact. *Valley Forge,* 454 U.S. at 487 n. 23, 102 S.Ct. at 766 n. 23. The amended complaint is grossly deficient in this respect. Appellants allege generally a drop in producers' share prices, *see supra* note 27, but the complaint fails to identify which companies or producers are affected, or to present any information showing a decline in price of shares, or to provide any other relevant information regarding the alleged injury. *See generally supra* notes 26–27 and accompanying text. Appellants' claim of shareholder injury is thus too conjectural and speculative to confer standing. *City of Los Angeles,* 461 U.S. at 101–02, 103 S.Ct. at 1664–65.

Moreover, a corporation is a legal entity capable of asserting its own legal rights and interests. There has been no demonstration by any of the appellants claiming shareholder status of need or reason for assisting a corporation or for pursuing remedies to which the corporation may be entitled. As a result, the appellants would be prudentially limited from asserting a claim for relief based upon the legal rights or interests of these third parties. *Valley Forge,* 454 U.S. at 474, 102 S.Ct. at 759; *Warth,* 422 U.S. at 499, 95 S.Ct. at 2205.

## D. *International Longshoremen's Association*

■ The International Longshoremen's Association, AFL–CIO, (ILA) has asserted standing for itself and through its members[31] on the basis of both economic and non-economic injuries. We have addressed the non-economic injury question, *see supra* Section A. Consumers, and the same reasoning applies with equal force to that type of injury claimed for ILA and its members. Accordingly, we conclude that the ILA does not possess standing on the basis of the alleged non-economic ethical injury, either in itself or derivatively through its members. *See McKinney,* 614 F.Supp. at 1235.

The economic injury alleged by the ILA is based upon damages assessed, or which may be assessed, against ILA as a result of civil suits arising from the ILA's refusal to handle allegedly illegal Soviet imports. Even if sufficient to satisfy the injury requirement of Article III, the alleged economic injury is not fairly traceable to the challenged action of the Customs Service. *Allen,* 468 U.S. at 751, 104 S.Ct. at 3325; *Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758. The injury results not from the conduct of the Customs Service in permitting allegedly illegal Soviet imports, but rather from the independent decision making and action of third parties not before this court, i.e., the instigators of the law suits against the ILA. *Allen,* 468 U.S. at 757, 104 S.Ct. at 3328; *Simon,* 426 U.S. at 41–42, 96 S.Ct. at 1925–26. More importantly, ILA's re-

---

**30.** The competitive injury alleged in the amended complaint is a form of economic injury.

**31.** While a labor organization such as the ILA may assert derivative or associational standing based upon its members, the ILA must allege sufficient facts to show that "its members would otherwise have standing to sue in their own right." *Hunt,* 432 U.S. at 343, 97 S.Ct. at 2441.

The amended complaint, however, avers that it is the ILA that is being subjected to civil suits for damages for refusing to unload Soviet ships. Since there is no allegation that ILA members are being named as defendants in these lawsuits, i.e., threatened with economic injury, the ILA must rely solely upon its own alleged economic injury as the basis for standing.

fusal to handle Soviet cargo, believed to be the product of forced labor which might contravene § 307, is a volitional action that is carried out with full awareness of the potential of adverse consequences.

The court, citing to *International Longshoremen's Association, AFL–CIO v. Allied International, Inc.*, 456 U.S. 212, 102 S.Ct. 1656, 72 L.Ed.2d 21 (1982), noted that the Supreme Court had determined that ILA's refusal to unload Soviet imports was a violation of the National Labor Relations Act. *McKinney*, 614 F.Supp. at 1236–37. And ILA knew or should have been aware that damages would be inflicted on third parties as a result of its failure to honor its cargo handling commitments. Under these circumstances, no matter how laudatory ILA's motivation may have been in refusing to unload Soviet cargo, the fact that ILA voluntarily and knowingly violated the law and subjected itself to third party damage suits for breach of its obligation to handle cargo sunders the causal connection between its economic injury and the Government's allegedly illegal action. *Allen*, 468 U.S. at 751, 104 S.Ct. at 3325; *Valley Forge*, 454 U.S. at 472, 102 S.Ct. at 758.[32] Accordingly, ILA has failed to allege sufficient facts to show that it has suffered, or is likely to suffer, an injury in fact traceable to action of the Customs Service. *Valley Forge*, 454 U.S. at 487 n. 23, 102 S.Ct. at 766 n. 23.[33]

### E. Public Interest Organizations

The WLF, the Union Mutual Foundation (UMF), the Constitutional Institute of America (CIA), the Ukrainian Congress Committee of America, Inc. (UCCA), and the Ukrainian Student Association of Michnowsky (TUSM) argue that they are parties having such a personal stake in the outcome of the controversy to assure the concrete adverseness which sharpens the presentation of issues upon which a court so largely depends for illumination of the issues. *Flast v. Cohen*, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968).

The WLF alleges [34] that, because of the refusal of the Customs Service to enforce § 307 with respect to Soviet forced-labor products, it is required to engage in extensive research and related activities, at its own expense, to obtain information needed to advise and inform its members and clients on the nature and extent of such products. The cases cited by the WLF [35] appear to support its contention that this type of injury would satisfy Article III. Where the injury in fact is not obviously within the reach of the particular statutory provision upon which the litigant has founded his claim, *Allen*, 468 U.S. at 754, 104 S.Ct. at 3326 ("judicially cognizable" injury), the court must consider the prudential limitations on standing to determine whether the litigant should be allowed to maintain the action. *Valley Forge*, 454 U.S. at 492–93 n. 4, 102 S.Ct. at 756 n. 4 (Brennan, J., dissenting); *see also Duke Power Co.*, 438 U.S. at 80–81, 98 S.Ct. at 2643.

We find no basis for concluding that the WLF's injury is obviously within the reach of § 307. The question, therefore, is whether this statutory provision, i.e.,

---

**32.** On appeal ILA has conceded that criminal prosecution of the ILA under 18 U.S.C. § 1761 (1982) for handling convict goods is remote. Accordingly, the injury from threat of criminal prosecution is clearly conjectural or speculative and insufficient to meet the injury requirement of Article III. *City of Los Angeles*, 461 U.S. at 101–02, 103 S.Ct. at 1664–65.

**33.** The court correctly concluded that ILA does not have standing to assert the interests of non-ILA members. *See supra* note 15.

**34.** The WLF's arguments that it has standing to sue as a consumer, shareholder, or in a representative capacity have been addressed *supra*.

**35.** To support its argument that this type of direct economic detriment is a sufficient basis for standing, the WLF relies primarily on *Pacific Legal Foundation v. Goyan*, 664 F.2d 1221 (4th Cir.1981). Reliance is also placed upon *Cervase v. Office of Federal Register*, 580 F.2d 1166 (3d Cir.1978), *Scientists Institute for Public*

§ 307,[36] can properly be understood as granting a person in the WLF's position a right to judicial relief, *Warth,* 422 U.S. at 500, 95 S.Ct. at 2205, that is, whether the WLF, as an organization, is within the "zone of interests" to be protected or regulated by the statute. *Data Processing Service,* 397 U.S. at 153, 90 S.Ct. at 829. As our discussion *supra* makes evident, § 307 was enacted to protect producers and workers from economic competition from imported products produced by forced labor, and to regulate the importation of forced-labor products for the benefit of consumers when equivalent domestic products are in short supply. *See supra* Section A. Consumers, Section B. Producers. The WLF, as an organization, is not within either category to be protected or regulated by § 307. *Valley Forge,* 454 U.S. at 474–75, 102 S.Ct. at 759–760. Even though the WLF may have suffered an injury in fact, this prudential limitation bars its claim as an organization to standing.

■ The UMF, in the amended complaint, avers that it undertakes "activities to protect and promote the welfare of the American worker," and objects to the importation of Soviet forced-labor products. Other than the terse objection to the importation of Soviet products allegedly produced by forced labor,[37] the UMF has singularly failed to set forth any allegation of injury, actual or threatened, as mandated by Article III. *Allen,* 468 U.S. at 751, 104 S.Ct. at 3325; *Gladstone, Realtors,* 441 U.S. at 98, 99 S.Ct. at 1607. Nor has the UMF alleged any facts, even remotely, showing the constitution of its membership, that its membership possesses any legal rights or interest which have been violated, or that it is a proper party to assert such legal rights or interests. Accordingly, there is no basis for this court to conduct a *Hunt* analysis. *See supra* note 13. The UMF has failed to allege facts sufficient to survive a motion to dismiss. *Simon,* 426 U.S. at 45 n. 25, 96 S.Ct. at 1927 n. 25.

■ With respect to the CIA the amended complaint states only that it is a joint project of the WLF and the UMF through which these foundations petitioned the Customs Service to prohibit the importation of Soviet forced-labor products. No allegation of injury having been made, there is no predicate for standing for the CIA. *Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758.

■ The amended complaint avers that the UCCA and the TUSM, and their members, object to and are adversely affected by the continued importation of Soviet forced-labor products as are the other appellants. The facts alleged in the complaint, taken as true for purposes of a standing analysis, must be sufficient to show that a party has suffered, or is likely to suffer, an injury in fact. *Valley Forge,* 454 U.S. at 487 n. 23, 102 S.Ct. at 766 n. 23. The UCCA and the TUSM, however, have not alleged, with any degree of specificity, that as organizations they have been injured or threatened with injury. *Allen,* 468 U.S. at 751, 104 S.Ct. at 3325; *see also supra* note 36. Nor has either the UCCA or the TUSM alleged any facts which even

*Information, Inc. v. Atomic Energy Commission,* 481 F.2d 1079 (D.C.Cir.1973), and *NORML v. United States,* 452 F.Supp. 1226 (D.D.C.1978).

**36.** Appellants have asserted that this cause of "action arises under 19 U.S.C. § 1307, and a right of judicial review is provided by.... 5 U.S.C. § 702." Section 702 provides, in pertinent part, that:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof....

Thus, even though a right to review may be asserted under § 702, the standing question must focus on the scope of the legal rights or interests devolving from the relevant statute. *Cf. Data Processing Service,* 397 U.S. at 153, 90 S.Ct. at 829.

**37.** To the extent that this objection could be construed as asserting a basis for standing as a consumer, *Warth,* 422 U.S. at 501, 95 S.Ct. at 2206 (court must construe the complaint in favor of the complaining party), the consumer argument was examined and rejected in Section A. Consumers *supra.*

remotely tend to show a derivative basis for standing. *Hunt,* 432 U.S. at 343, 97 S.Ct. at 2441. Neither the UCCA nor the TUSM pleadings are sufficient to survive a motion to dismiss. *Simon,* 426 U.S. at 45 n. 25, 96 S.Ct. at 1927 n. 25.

 The amended complaint also alleges that the Ukrainian appellants "are particularly injured in that a large portion of the political prisoners in labor camps in the Soviet Union are from the Ukraine." Leaving aside the question of whether this alleged injury complies with the injury requirement of Article III, this alleged injury is not causally connected to any conduct, let alone putatively illegal conduct of the Customs Service. *Allen,* 468 U.S. at 751, 104 S.Ct. at 3325. The conduct of the Customs Service has nothing whatsoever to do with the alleged fact that Ukrainians are political prisoners in Soviet labor camps, which is the result solely of internal political and policy machinations of the Soviet government. Further, no conceivable relief granted by this court could possibly redress such an alleged injury, *Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758, as rectification of such an alleged injury lies solely within the control of the Soviet government.

### CONCLUSION

We have examined in some detail, as suggested by *Allen,* 468 U.S. at 752, 104 S.Ct. at ——, the claims of the appellants that they have standing to maintain this action. In doing so, we are required to accept as true all material allegations of the complaint and to construe the complaint in favor of the complaining party. On the other hand, the complaining party must set forth the claims of injury and other constitutional and prudential requirements of standing with some specificity and concreteness. *See Warth,* 422 U.S. at 508–509, 95 S.Ct. at 2210.

For the reasons discussed, we find the appellants' amended complaint inadequate to show that appellants possess standing in any of the capacities that they have asserted or for any of the injuries they have claimed. As appellants who are consumers, the economic injury asserted, which in truth may be nothing more than an ethical or moral injury, is not within the zone of interests covered by § 307 and the non-economic injury claimed is neither of a type that would satisfy Article III nor within the protection or regulation of the statute. As appellants who are shareholders, sufficient facts showing Article III injury have not been set forth and the prudential bar applies to the assertion of third party rights. WFL in its association or derivative status has failed to demonstrate the *Hunt* requirements of germaneness to the organization's purposes and judicially cognizable injury to members. Moreover, its direct injury is clearly not within the "zone of interests" of § 307. ILA does not allege facts sufficient to claim associational standing and, as an organization, any injury it suffers is due to the action of parties not before the court rather than from the putative illegal acts of the Customs Service. Finally, with respect to the other organizations, the amended complaint of the appellants is not sufficient to show Article III injury.

Having concluded that none of the appellants possesses standing, we need not, and do not, address the mootness issue.

Accordingly, we affirm the decision of the Court of International Trade on the basis that none of the appellants has standing, either directly or in any representative capacity, to maintain this action.

AFFIRMED.

### APPENDIX OF APPELLANTS

Representative Stewart B. McKinney
Representative Andrew Jacobs, Jr.
Representative Bob Livingston
Representative Thomas N. Kindness
Representative Philip M. Crane
Representative Robert A. Roe
Representative Eldon Rudd

Representative Daniel B. Crane
Representative James H. Scheuer
Representative Peter H. Kostmayer
Representative Norman D. Shumway
Representative Dan Burton
Representative Gerald B.H. Solomon
Representative Raymond J. McGrath
Representative Norman F. Lent
Representative Mickey Edwards
Representative Webb Franklin
Representative William F. Clinger, Jr.
Representative George C. Wortley
Representative William J. Hughes
Representative Antonio Borja Won Pat
Representative Dan R. Coats
Representative Edward J. Markey
Representative Larry E. Craig
Representative Thomas J. Bliley, Jr.
Representative Tom Lewis
Representative Manuel Lujan, Jr.
Representative Bill McCollum
Representative Robert E. Badham
Representative Wayne Dowdy
Representative Nancy L. Johnson
Representative Edward F. Feighan
Representative Tom Corcoran
Representative Mark Siljander
Senator Jesse A. Helms
Senator Steven D. Symms
Washington Legal Foundation
Union Mutual Foundation
Constitutional Institute of America
Ukrainian Congress Committee of America, Inc.
Ukrainian Student Association of Michnowsky (TUSM)
International Longshoremen's Association, AFL–CIO
Constance Claffey