**CHINA DIESEL IMPORTS, INC.,**
a California Corporation,
Plaintiff,

v.

**The UNITED STATES, Defendant.**
Court No. 92–10–00696.
Slip Op. 94–90.

United States Court of
International Trade.

June 2, 1994.

States Customs Service excluding certain JINMA model 1100 diesel engines from entry on the ground that the engines are the product of prohibited labor as defined in § 307 of the Tariff Act of 1930. *See* 19 U.S.C. § 1307 (1988). Both CDI and Customs move for summary judgment on the issue of whether Customs correctly determined that the class of diesel engines in question was the product of forced or convict labor and therefore properly prohibited entry into the United States.

## *BACKGROUND*

Plaintiff is an American importer of small diesel engines from various manufacturers in the People's Republic of China ("PRC"). A shipment of 50 diesel engines, JINMA model 1100 ("subject engines"), arrived at the port of Los Angeles on October 19, 1991 and was entered into the United States on or about November 5, 1991. The invoice identified the subject engines as "DIESEL ENGINES (JINMA BRAND) MODEL 1100" manufactured by "Yunnan Machinery Imp. & Exp., 10th Fl. Beijing Rd, Kunming, CN." Protest No. 2501–92–100030, Ex. B, at 10.

At the time of entry, certain products from China were suspected of being manufactured by prison labor camps. On October 9, 1991, Customs had published a notice in the Federal Register, 56 Fed.Reg. 50,972 (Dep't Treas. 1991), that a public hearing would take place on November 1, 1991 "to obtain any relevant information concerning recent allegations that merchandise [was] being imported into the United States which was produced in the People's Republic of China by means of convict, forced or indentured labor." *Id.* at 50,-972.

The Commissioner of Customs issued a detention order on November 14, 1991 advising all district directors to withhold the release of the subject engines. Def.'s Ex. H; Pl.'s Ex. 14. Customs issued a demand to CDI for redelivery of the fifty JINMA model 1100 diesel engines on the following day. Def.'s Ex. J. CDI was able to redeliver forty-nine of the fifty engines, although one engine sold prior to this notice was irretrievable. Pl.'s Ex. 1, Decl. of Hardy Day, ¶ 14.

James M. Zimmerman, La Jolla, CA, for plaintiff.

Frank W. Hunger, Asst. Atty. Gen., Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Carla Garcia–Benitez, Mark G. Nackman, Office of Asst. Chief Counsel, Intern. Trade Litigation, U.S. Customs Serv., of counsel, Washington, DC, for defendant.

## *OPINION*

RESTANI, Judge:

Plaintiff China Diesel Imports, Inc. ("CDI") challenges the decision of the United

CDI has made a number of attempts to establish that JINMA model 1100 diesel engines were not produced with prohibited labor.[1] In particular, on January 14, 1992, CDI submitted a "Verification of Labor employed by Yunnan JINMA Diesel Engine Works," dated December 27, 1991, which claims that the subject engines were produced by "employees who work voluntarily and receive wages for their labor" and that "no prison, forced, or slave labor is employed ... in its production process of export products." Def.'s Ex. N, at 32. CDI offered this verification as "proof of admissibility" pursuant to 19 C.F.R. § 12.43(a) (1993).[2]

On January 27, 1992, Customs determined that diesel engines manufactured in China by the Golden Horse (JINMA) Diesel Engine Factory are produced with convict and/or forced and/or indentured labor and therefore should be denied entry pursuant to 19 U.S.C. § 1307. This determination was published on March 18, 1992 in the Federal Register with an effective date of March 23. *Merchandise Imported from the People's Republic of China Produced by Convict, Forced or Indentured Labor,* 57 Fed.Reg. 9469 (Dep't Treas.1992). Accordingly, plaintiff's engines were excluded from entry and plaintiff was so advised on April 14, 1992.

CDI filed a protest of the determination on May 21, 1992. CDI argued that its engines were not made with convict labor, and that no comparable engine is made domestically and therefore the "consumptive demand exception" of 19 U.S.C. § 1307 applies.[3] Pl.'s Ex. 20, Attachment A, ¶¶ 11 and 12(D). A memorandum written by Stuart Seidel, the director of International Trade Compliance Division, Office of Regulations and Rulings, on March 2, 1993, revealed that "[a] thorough examination of the evidentiary record in this case leads us to conclude that the information compiled during the investigation that produced the January 27, 1992, order was not sufficiently conclusive to justify the exclusion of the diesel engines from entry. However, ... in June 1992, Customs received confirmation[4] that the diesel engines were, in fact, convict-made." Pl.'s Ex. 22, at 3–4. On October 29, 1992 Customs inspected the JINMA Diesel Engine Factory and reported "no direct evidence of prison labor involving assembly of diesel engines." Pl.'s Ex. 25, at 1; *see also* Def.'s Ex. R. However, a discussion with Reform Through Labor Deputy Director Wang Migdi suggested that "some of the buildings in the JINMA Diesel Engine factory compound are in fact part of the Yunnan No. 1 Prison.... [T]he two entities share a compound and are not completely separate facilities as the Yunnan authorities claimed." Pl.'s Ex. 25, at 3. A follow up visit was requested but as of October 1993 this visit had not been granted by the Chinese government.[5]

Customs did not formally deny plaintiff's protest until March 1993, almost a year after the protest was filed. The parties failed to advise the court of the actual denial of pro-

1. *See* Pl.'s Ex. 1, Decl. of Hardy Day, ¶¶ 21–39. In his declaration, Day detailed his earlier visits to the engine factory in China and explained that he did not see any signs of prison, forced or indentured labor at the engine factory.

2. "If an importer of any article ... desires to contend that the article was not mined, produced, or manufactured in any part with the use of a class of labor specified in section 307, Tariff Act of 1930, he shall submit to the Commissioner of Customs ... a certificate of origin in the form set forth below, signed by the foreign seller or owner of the article." 19 C.F.R. § 12.43(a).

3. The provisions of § 1307 that prohibit the importation of convict-made goods are not applicable to "goods, wares, articles, or merchandise so mined, produced, or manufactured which are not mined, produced, or manufactured in such quan-

tities in the United States as to meet the consumptive demands of the United States." 19 U.S.C. § 1307 ("consumptive demand exception").

4. The June 1992 confirmation, from the SCR/Hong Kong office, was that the JINMA/Golden Horse diesel engine facility is a reform-through-labor/education-through-labor facility which produces the "Golden Horse" (JINMA) model 1100 diesel engine. Def.'s Ex. BB, at 2.

5. On August 7, 1992 the United States signed a Memorandum of Understanding ("MOU") with the People's Republic of China. The MOU promised further investigations by the United States into the prison camps of China. Pursuant to this agreement, the State Department requested that the Golden Horse (JINMA) Diesel Engine Factory be examined for further evidence of prohibited labor manufacturing activities.

test, but the court deemed the denial to have occurred because of the passage of time. *China Diesel Imports, Inc. v. United States,* Slip Op. 93–91, 1993 WL 190925 (June 2, 1993) (denying defendant's motion to dismiss for lack of subject matter jurisdiction).[6] Plaintiff's action, filed on October 16, 1992, challenges the protest denial and asserts that the subject diesel engines should be allowed entry into the United States.

### DISCUSSION

#### A. Standard of Review

The court's jurisdiction in this case is predicated on 28 U.S.C. § 1581(a) (1988) because China Diesel commenced this action to contest the denial of its May 21, 1992 protest. In a civil action contesting the denial of a protest, the court must make its determinations on the basis of the record before the court. 28 U.S.C. § 2640(a) (1988). The question here is whether the court will limit its review to the record before the agency on some or all issues, will refrain from reviewing certain issues at all, or will conduct a trial *de novo* as is generally appropriate for protest denial cases. Plaintiff does not appear to request a trial *de novo* but seeks review of the record on an ordinary Administrative Procedure Act ("APA") basis.

Defendant, on the other hand, contends that the notice published in the Federal Register, the public hearing and the subsequent investigation constituted a rulemaking procedure and that this portion of the decision, at least, is non-reviewable. *See Florsheim Shoe Co. v. United States,* 744 F.2d 787, 796 (Fed. Cir.1984). Defendant argues that an agency's actions promulgating a rule that implements a statute are entitled to substantial deference. *See Central Soya Co. v. United States,* 761 F.Supp. 133, 137 (Ct. Int'l Trade 1991) (citing *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984)).

■ The APA defines a rule as

the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy.

5 U.S.C. § 551(4) (1988). A rule is legislative in nature and is intended to have prospective effect only, while an adjudication is judicial, has an accusatory flavor and relates to past or current events. *American Express Co. v. United States,* 472 F.2d 1050, 1055 (C.C.P.A. 1973).

■ In this case Customs gathered evidence to determine whether the importation of particular diesel engines by CDI would violate 19 U.S.C. § 1307. Customs' determination charged CDI with importation of convict-made goods, demanded redelivery of the engines previously imported and excluded the goods from entry. 57 Fed.Reg. at 9470; Def's Ex. J. The determination by Customs to exclude particular diesel engines made in a specific factory was not a rulemaking, but rather an adjudication pursuant to 19 U.S.C. § 1307 and therefore not entitled to rulemaking deference.

For similar reasons *Florsheim Shoe Co.,* 744 F.2d 787, does not apply. There is no room for broad executive discretionary decisionmaking here. *See* 19 U.S.C. § 2464 (1988) (granting executive authority to implement Generalized System of Preferences). As the discussion of the statute and its legislative history reveal, there are very specific requirements for exclusion of goods under 19 U.S.C. § 1307—requirements that are suitable for adjudication.

■ Section 307 of the Tariff Act of 1930, as amended, provides that

[a]ll goods, wares, articles, and merchandise ... manufactured wholly or in part in any foreign country by convict labor or/and forced labor or/and indentured labor under penal sanctions shall not be entitled to entry at any of the ports of the United States, and the importation thereof is hereby prohibited....; but in no case shall such provisions be applicable to goods, wares, articles, or merchandise so mined, produced, or manufactured which are not mined, produced, or manufactured in such quantities in the United States as to meet

---

**6.** Defendant has abandoned its challenge to jurisdiction.

the consumptive demands of the United States.

19 U.S.C. § 1307. Section 1307 was enacted by Congress to protect domestic producers and workers from the unfair competition that would result from the importation of foreign goods produced by forced labor, only allowing access to such goods when they are in short supply domestically. *McKinney v. United States Dep't of Treas.*, 799 F.2d 1544, 1557 (Fed.Cir.1986).

"Forced labor" is defined in § 1307 as "all work or service which is exacted from any person under the menace of any penalty for its nonperformance and for which the worker does not offer himself voluntarily." 19 U.S.C. § 1307. Convict or prison labor is not defined in § 1307 but does not include labor by prisoners on parole or probation. *See* C.S.D. 79–317, 13 Cust.Bull. 1473, 1474–75 (1978). Section 1307 does not define "indentured labor under penal sanctions." The legislative history, however, defines this labor as a "contract entered into by an employee the enforcement of which can be accomplished by process or penalties." 71 Cong.Rec. 4489 (1929) (statement of Sen. Blaine). Congress emphasized that an indentured contract with penal sanctions has a definite and specific meaning in the countries and colonies where such contracted labor is used. *Id.*

The regulations provide that if a Customs officer has reason to believe that any class of merchandise is, or is likely to be, imported into the United States in violation of § 1307 he or she shall communicate this belief to the Commissioner of Customs. 19 C.F.R. § 12.-42(a) (1993). On receiving this communication, the Commissioner will investigate the charges, considering any representations offered by foreign interests, importers, domestic producers, or other interested persons. *Id.* § 12.42(d). If the Commissioner finds at any time "that information available reasonably but not conclusively indicates that merchandise within the purview of section [1307] is being, or is likely to be, imported, ... the district directors shall thereupon withhold release of any such merchandise." *Id.* § 12.-42(e).

Once the Commissioner determines that merchandise is subject to the provisions of § 1307, he or she is required to publish "a finding to that effect" in the Customs Bulletin and Federal Register. *Id.* § 12.42(f). Indeed, the evidentiary standards established by the Customs Service require that the Commissioner "*actually determine*[ ] 'that the merchandise is subject to' section 1307." *Enforcement of U.S. Prohibitions on the Importation of Goods Produced by Convict Labor: Hearing Before the Subcomm. on Int'l Trade of the Senate Comm. on Finance,* 99th Cong., 1st Sess. 53, § II, ¶ C (1985) (emphasis added) ("Evidentiary Standards"). Additionally, § 1307 only prohibits the entry of merchandise that "*actually contains* 'wholly or in part' components made with prohibited labor." Evidentiary Standards, at § III, ¶ A (emphasis added).

A review of cases decided under § 1307 reveals that the statute applies where Customs has specific information that imported merchandise is produced with prohibited labor. Customs has applied § 1307 where ex-prisoners have attested that certain products were produced by prison labor. *Crabmeat from the Soviet Union, in id.* at 139. Products have also been denied entry under § 1307 when the importer has admitted that the machine was produced in a penitentiary. *Gymnastic Equipment from Canada, in id.* at 139–40. Even in situations where there is *general* evidence of prison labor products, Customs has refused to find imports violative under § 1307 when the evidence does not disclose *positive, specific* evidence of the use of prison labor or does not constitute first-hand knowledge of alleged forced labor practices. *See Cameras from Japan, in Forced Labor in the Soviet Union: Hearing before the Subcomm. on Human Rights and Int'l Orgs. of the House Comm. on Foreign Affairs and the Comm'n on Sec. and Cooperation in Europe,* 98th Cong., 1st Sess. 79 (1983); *Cameras from East Germany, in id.*

Once merchandise is determined to be subject to § 1307, it may not be imported unless the importer can establish "by satisfactory evidence that the merchandise was not mined, produced, or manufactured in any part with the use of a class of labor specified in the finding." 19 C.F.R. § 12.42(g). An importer may contest a finding by submitting

to Customs, within three months after the date of importation, a certificate of origin signed by the foreign seller and a statement from the importer showing that "every reasonable effort [was made] to determine the source of the merchandise." *Id.* § 12.43(a), (b) (1993) ("proof of admissibility"). If the importer fails to offer proof of admissibility that the merchandise does not violate the statute, Customs is required to notify the importer in writing that the merchandise is excluded from entry into the United States. *Id.* § 12.44. Upon the expiration of sixty days after notification, the merchandise is treated as abandoned and destroyed, unless the importer exports the merchandise or files a protest provided by § 514 of the Tariff Act of 1930. *Id.* This is clearly an adjudication, not rulemaking or a discretionary foreign policy choice. Thus, this is a reviewable issue. The next question is what is the standard of review.

Once a protest is filed and denied and suit is filed in this court, the court is directed to adjudicate the matter on the record before the court. 28 U.S.C. § 2640(a)(1). It is undisputed that ordinarily this means that the court will itself adjudge all factual issues *de novo*. *ITT Corp. v. United States*, 24 F.3d 1384, 1389 (Fed.Cir.1994) (interpreting § 2640(a) to require that a court make its own findings of fact rather than relying on those on the agency record); H.R.Rep. No. 1235, 96th Cong., 2d Sess. 59 (1980) (interpreting § 2640(a) as providing for a trial *de novo* ), *reprinted in* 1980 U.S.C.C.A.N. 3729, 3770–71.

In the specific case of customs brokers' license denials, relied on by defendant, because of conflicting statutory provisions, 28 U.S.C. § 2640(a) is read to mean merely that the court may accept supplemental information and decide whether to remand to the agency for final decisionmaking. *Compare* 28 U.S.C. § 2640(a) *with* 19 U.S.C. § 1641(b)(2) *and* (e)(3), (4) (1988) (providing for review on substantial evidence basis and grounds for receiving new evidence). The peculiar competing statutory provisions and the nature of licensing weigh against ordinary *de novo* trial. *See Bell v. United States*, 839 F.Supp. 874, 877–79 (Ct. Int'l Trade

1993); *Pietrofeso v. United States*, 801 F.Supp. 743, 744–45 (Ct. Int'l Trade 1992). There are no such competing statutory provisions, nor indications of legislative intent, weighing against a trial *de novo* in a protest denial case, such as is at hand.

■ Despite this situation, plaintiff seems to request only that Customs make new factual findings, which would then be reviewed by the court under APA standards. *See* 5 U.S.C. § 706 (1988). Of course, APA review is applicable to cases covered by 28 U.S.C.A. § 2640(e) (West Supp.1994), which specifically excludes cases covered by 28 U.S.C. § 2640(a). Thus, the court concludes that in a case brought by an importer pursuant to protest denial jurisdiction, APA review is inappropriate and summary judgment may be granted only if there are no material factual disputes. USCIT Rule 56.

### B. Prison Labor

■ The record before the agency that has been presented to the court contains a November 1991 report from the SCR/Hong Kong Customs office, which reflects that "JINMA" (translated as "GOLDEN HORSE") brand diesel engines are being manufactured by forced or prison labor in China. Def's Ex. F. According to the report, the manufacturer of these engines is the GOLDEN HORSE DIESEL (ENGINE) FACTORY, Yunnan Province, China. *Id.* An unidentified source of the SCR/Hong Kong office traced the engines imported by CDI to this factory. *Id.* This report is the primary documentary evidence supporting Customs' original determination that the subject engines were being produced with prohibited labor in violation of § 1307. *See* Def.'s Ex. M. This report, however, does not definitively establish that JINMA model 1100 diesel engines, the model imported by CDI, were made with forced or prison labor by the JINMA (Golden Horse) Diesel Engine Factory.

Other documentary evidence consists of a report from Asia Watch. On November 21, 1991, the American Embassy in Beijing sent to the State Department a telegram concluding that the Asia Watch report "is based on several solid facts surrounded by less firm

supposition. . . . The Asia Watch analysis of the Yunnan prison labor system and its overall economic role in the province is apparently based on limited information and is not completely accurate." Pl.'s Ex. 19.

In addition, an internal memorandum prepared by Stuart Seidel[7] stated that "[a] thorough examination of the evidentiary record in this case leads us to conclude that the information compiled during the investigation that produced the January 27, 1992, order was not sufficiently conclusive to justify the exclusion of the diesel engines from entry." Pl.'s Ex. 22, at 3. Seidel nevertheless affirmed Customs' determination based on an informational report dated June 11, 1992. *Id.* at 5. In this report, received almost three months after Customs issued its determination to exclude the engines, the SCR/Hong Kong identified the JINMA (Golden Horse) Diesel Engine Factory as a forced labor enterprise that used such labor to produce JINMA model 1100 diesel engines. Def's Ex. BB.

In opposition is the following information: Mr. Day, President of CDI, informed Customs that during his 1983 visit to the factory he saw no guards, guns, or barbed wire to indicate that the factory doubled as a prison facility. Day's declaration states that he has "no evidence in [his] possession, nor [has he] received any information at any time, to prove that the detained engines and accompanying tool kits are produced with forced, convict or slave labor in violation of Section [1307]." Pl.'s Ex. 1, Decl. of Hardy Day, ¶ 18. Although Day visited the factory, Customs never asked the Chinese for an inspection of the JINMA (Golden Horse) Diesel Engine Factory, prior to making its determination. Customs claims that relations with China, at the time, did not permit an inspection of the factory. James Zimmerman, plaintiff's attorney, declares that in December 1991, representatives of JINMA (Golden Horse) Diesel Engine Factory welcomed an inspection of their facility. Pl.'s Ex. 33, Decl. of James Zimmerman, ¶ 2.

Also on record is a verification of labor from Mao Yong Ying, the Factory Director of JINMA (Golden Horse) Diesel Engine Factory, which states that the subject engines were not produced with prohibited labor.[8] Pl.'s Ex. 16. This verification was submitted as a proof of admissibility to contest Customs' detention and subsequent decision to deny entry to the subject engines. 19 C.F.R. § 12.43(a), (c). The verification does not comply with the 'certificate of origin' form specified in § 12.43(a). Customs argues, moreover, that the verification is ambiguous with respect to the statement that the employees work "voluntarily," and that the statement that no proscribed labor is used in the production of export products has no evidentiary basis. Customs further notes that the verification avers only that no prison labor is used in the manufacture of exported products, leaving open the question of whether prison labor is used for other products and, if so, how exported products are segregated.

It appears to the court that there is very little value to evidence of a visit in 1983. The remaining evidence plaintiff offers is a very sketchy certificate, *i.e.*, the verification which is not presented in affidavit form. This will certainly not result in summary judgment for plaintiff, who has the burden of proof in this matter. *See* 28 U.S.C. § 2639 (1988).[9]

---

7. Stuart Seidel is the Director of the Office of Regulations and Rulings, which is responsible for recommending to the district director whether to approve or deny a protest. Plaintiff's protest questioned Customs' exclusion of the subject engines. Mr. Seidel believed his role to be reviewing the evidence and determining whether the diesel engines fell within the scope of the decision by the Commissioner of Customs. Pl.'s Ex. 21, Deposition of Stuart Seidel, at 63–65.

8. The verification provides that
   the following goods are produced or assembled by employees who work voluntarily and receive wages for their labor:

50 JINMA BRAND 1100 DIESEL ENGINES and ACCOMPANYING TOOL KITS
The undersigned further verifies that no prison, forced, or slave labor is employed by the YUNNAN JINMA DIESEL ENGINE WORKS in its production process of export products. Pl.'s Ex. 16.

9. The evidentiary standards for a § 1307 determination also provide that because this statute was intended to protect American industries from foreign competitors who obtain a competitive advantage by using prison labor, the "Commissioner should make a specific finding that the use of forced labor gives that foreign producer a

Although it has a documentary record, some of which may be admissible, defendant likewise has failed to submit its information in affidavit form on many key points. Thus, its motion also is denied as to this issue.[10]

### C. Consumptive Demand Exception

■ Section 1307 specifically provides that the import ban applies only to goods that are produced in quantities in the United States sufficient to meet the consumptive demands of United States consumers. 19 U.S.C. § 1307. Where the goods are in insufficient supply, Customs must allow entry of merchandise even if manufactured by forced or indentured labor. *Id.*

Customs concluded that the consumptive demand exception did *not* apply in this case, based on a facsimile received by Customs on January 30, 1992 stating that a comparable diesel engine was manufactured in the Unit-ed States by Cummins/Onan Engine Company. Def.'s Ex. T. However, a facsimile received on February 20, 1992 explained that "Cummins misunderstood regarding 'comparable engine.' ... [Cummins does] make a comparable '*gas*' engine." Def.'s Ex. U (emphasis added). In fact, Special Agent Richard Quintal[11] concluded that the exception *did* apply because information obtained from Cummins/Onan revealed that "Cummins Engine Company, Inc., and its subsidiary the Onan Company do not make the equivalent diesel engine of the 1100 JINMA engines." Pl.'s Ex. 15, Ex. A, at 4–5. The internal memorandum prepared by Stuart Seidel with regard to CDI's protest concluded that "there are no diesel engines comparable to the JINMA model 1100 produced in the U.S., [but] there is a domestically-produced gasoline-powered engine." Pl.'s Ex. 22, at 7.[12]

more than de minimus [sic] price advantage over American producers." Evidentiary Standards, at § III, ¶ D(2). In order to avoid the exclusion of a class of merchandise that is overbroad, the *de minimis* rule requires Customs to determine on a case-by-case basis that goods excluded from entry are in fact gaining more than a *de minimis* competitive advantage resulting from the use of forced labor. *Id.* at § III, ¶ E(1). If the Commissioner cannot make a specific finding regarding price advantage because the information is unavailable or the economy of the foreign country is state-controlled, the evidentiary standards provide that:

[T]he Commissioner should consider the following in determining whether a competitive advantage resulting from the use of forced labor is more than de minimus [sic]:

(a) whether the economy is free market or state controlled;

(b) the nature of the product (whether labor cost is a significant component);

(c) the (apparent) value added by use of forced labor;

(d) the number of parts added or assembled by use of forced labor, relative to the number of parts in the finished product;

(e) the percentage of time required for production of the article which is contributed by forced labor; and/or

(f) any other relevant information available.

*Id.* at § III, ¶ D(2). The *de minimis* rule is intended to prevent an agency from denying entry to goods when the economic contribution of the prison made portion of the product is too small to impact American producers. *Id.* at § III, ¶ D(1). As argued by plaintiff here, the *de minimis* issue is not significantly different from the basic prison labor issue. There is no multiple part source issue.

10. Even if merchandise is properly excluded under § 1307, the merchandise also may be allowed entry under the "Hendrick Rule." The rule allows admission of merchandise if: (1) the convicts work on their own time; (2) they work voluntarily; (3) the government of the country in question receives no pecuniary benefit; and (4) the wages paid the workers are comparable to non-convict labor. *Furniture from Mexico* in Evidentiary Standards, at 139. In the past Customs has allowed entry of merchandise based on the Hendrick rule. *See Handicraft Articles from Mexico,* in *id.* at 141; *Hand-made Rugs from Portugal,* in *id.* at 143–44.

In this case, Customs contends that an analysis of the Hendrick rule was unnecessary because Customs had information that receiving wages for labor in China does not establish that the merchandise is produced without prison labor. If plaintiff wishes to take advantage of this rule, it also must demonstrate that it has evidence to support its application. Plaintiff failed to support an application of this rule in its moving papers.

11. Richard Quintal, a special agent with Customs, was assigned to investigate the allegations concerning the importation of CDI's engines, suspected of being manufactured by prison labor. Pl.'s Ex. 15, Deposition of Richard Quintal, at 4–5.

12. The distinction between diesel and gas engines is significant. China Diesel's president, Hardy Day, testified that there are gasoline engines available domestically for use as generator sets. Def.'s Ex. DD, Deposition of Hardy Day at 77. However, Day further explained that 90–95% of his customers previously owned gasoline

The deposition of Cummins/Onan representative, Kent Lobsiger, revealed that although the discussions in early 1992 "concentrat[ed] on gasoline-powered engines," Onan does manufacture diesel engines comparable to the JINMA model 1100. Def.'s Ex. V., Deposition of Kent Lobsiger, at 51, 59. In his deposition, Lobsiger identified the "Industrial Engine, Diesel, Air–Cooled," 14.6 horsepower engine manufactured by Onan, as an engine which would drive the 8–kilowatt generator, *id.* at 52–54, and was therefore comparable to the JINMA model 1100. Lobsiger further concluded that Onan engine model DJA 7.2 BHP (brake horsepower), while comparable in "operating speed" to the JINMA model 1100 diesel engine, could not drive an 8–kilowatt generator of the type used to create the generator sets sold by CDI. *Id.* at 52–53.

The only information concerning the supply of Cummins/Onan diesel engines was submitted by defendant with its final brief via the affidavit of Brian Marier, Manager, Government Business for Onan, who confirmed that the comparable engines produced by Onan were actually produced in the United States and available during the period January 1, 1991 to December 31, 1992. Def.'s Ex. CC, Affidavit of Brian Marier, at 1. This information, however, does not specify whether sufficient quantities of these engines were available to meet the consumptive demand of U.S. consumers. *See McKinney,* 799 F.2d at 1577.

CDI argues that prior to Customs' determination Customs refused to allow CDI to contact U.S. firms or submit information demonstrating that comparable engines are not produced in the United States.[13] Whether this is true or not, § 1307's implementing regulations require that Customs consider "representations offered by foreign interests, importers, domestic producers, or other interested persons," as part of its investigation.

19 C.F.R. § 12.42(d). That investigation apparently did not result in a great deal of information on the supply sufficiency issue.

It appears to the court that the affidavits leave unresolved the issue of whether a "comparable" engine was produced in sufficient supply domestically. Therefore, summary judgment on this issue is not appropriate.

### CONCLUSION

The parties' cross-motions for summary judgment are denied. The parties should meet and confer as to an appropriate trial schedule. The proposed schedule is due within 30 days hereof.

---

engines and replaced these engines with diesel engines due to greater efficiency at a lower cost. *Id.* at 79; *see also* Pl.'s Ex. 1, Decl. of Hardy Day, ¶¶ 40–44 (stating clear differences between gasoline and diesel engines are fuel efficiency, mechanics and simplicity of design, operating costs, life expectancy, relative safety of diesel fuel, and maintenance).

**13.** The declaration of James Zimmerman claims that "[i]n no uncertain terms, Mr. Quintal made it clear that he did not want my office or Plaintiff to contact domestic manufactures [sic] for information [regarding the investigation of the consumptive demand exception]." Pl.'s Ex. 33, ¶ 4.