**CHINA DIESEL IMPORTS, INC.,**
a California Corporation,
Plaintiff,

v.

**The UNITED STATES, Defendant.**

**Court No. 92–10–00696.**

United States Court of
International Trade.

Dec. 7, 1994.

Chapin, Fleming & Winet, James M. Zimmerman, Edward D. Chapin and Victoria Chen, San Diego, CA, for plaintiff.

Frank W. Hunger, Asst. Atty. Gen., Joseph I. Liebman, Atty. in Charge, International Trade Field Office, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Carla Garcia–Benitez, Mark G. Nackman, Office of Asst. Chief Counsel, Intern. Trade Litigation, U.S. Customs Service, Washington, DC, of counsel, for defendant.

## *OPINION*

RESTANI, Judge:

On June 2, 1994, the court denied cross-motions for summary judgment and ordered trial in this matter. *See China Diesel Imports, Inc. v. United States*, 855 F.Supp. 380 (Ct.Int'l Trade 1994). That opinion sets forth all relevant background information. To summarize, in March 1992 diesel engines manufactured by plaintiff China Diesel Imports, Inc. ("CDI") were excluded by the United States Customs Service ("Customs") as goods made by convict or forced labor. CDI has filed suit seeking entry of its merchandise. Thus, it has the burden of proof. *Id.* at 386. The two basic issues set for trial were whether the diesel engines at issue were manufactured by convict or other forced labor, and whether domestic production of a substitute product was sufficient to meet domestic demand.[1]

---

**1.** The governing statute, 19 U.S.C. § 1307, provides:

All goods, wares, articles, and merchandise mined, produced, or manufactured wholly or in part in any foreign country by convict labor

■ As to the first issue, the court finds that the subject diesel engines were manufactured by convict labor for the reasons that follow. Both documentary evidence published for internal Chinese consumption and official U.S. government publications are consistent in their description of the basic Chinese penal institutions. Specifically, China has traditional style prison facilities, but it also maintains "Reform Through Labor" facilities, which may be either camps or factories. Persons convicted of crimes are assigned to both types of institutions. In addition, China has "Education Through Labor" facilities, to which persons are assigned following local administrative action. All three facilities are forced labor institutions. The first two, however, are clearly penal, and the inmate workers therein are convicts.

The model 1100 diesel engines at issue were produced by the JINMA Diesel Engine Factory in Kunming, Yunnan Province, China. The JINMA factory is described as a "Reform Through Labor" facility in at least two Chinese publications. *See* Def.'s Exs. I, at 234, 236, 42, and N, at 36 (translated in Def.'s Ex. H, at 26, 31, 35, and 5–6, respectively).[2] It is associated in some undisclosed way with Yunnan Prison No. 1, to which it is adjacent.

In coming to these conclusions, the court has credited most heavily various Chinese government and reference publications, which seem designed to extol production gains or provide reference data, and which appear entirely trustworthy on the issue of the status of the JINMA factory as a penal facility. This information is corroborated by unplanned interviews conducted by a State Department employee with persons living in the vicinity of the JINMA factory. The documents alone, however, would have sufficed. The conclusion is also corroborated by the prevarication of the JINMA factory manager[3] and what the court concludes were staged tours of the facility.[4]

In late October 1992, State Department representatives and plaintiff's representatives visited the JINMA facility on separate trips. The number of workers observed during such visits did not match published data on the number of workers employed. Furthermore, the production observed did not comport with the factory manager's claim of one engine produced every seven minutes. The administration building of four or five floors was reputed to house in excess of 200

---

or/and forced labor or/and indentured labor under penal sanctions shall not be entitled to entry at any of the ports of the United States, and the importation thereof is hereby prohibited, and the Secretary of the Treasury is authorized and directed to prescribe such regulations as may be necessary for the enforcement of this provision. The provisions of this section relating to goods, wares, articles, and merchandise mined, produced, or manufactured by forced labor or/and indentured labor, shall take effect on January 1, 1932; but in no case shall such provisions be applicable to goods, wares, articles or merchandise so mined, produced, or manufactured which are not mined, produced, or manufactured in such quantities in the United States as to meet the consumptive demands of the United States.

"Forced labor", as herein used, shall mean all work or service which is exacted from any person under the menace of any penalty for its nonperformance and for which the worker does not offer himself voluntarily.
19 U.S.C. § 1307 (1988).

2. Other exhibits are not as clear as to whether JINMA is a "Reform Through Labor" or "Education Through Labor" facility. The two programs are referred to collectively.

3. The factory manager did not appear at trial. His statements were offered by plaintiff through oral testimony, and by defendant through documentary evidence.

4. A former Chinese prisoner also testified as to conversations with a former worker at JINMA. CDI agrees that the former Chinese prisoner spoke of producing the model X195 engine but CDI asserts that, unlike the X195, the JINMA model 1100 was not produced in a prison setting in 1990–91. The JINMA factory manager, however, stated that only chemicals, not engines, were produced in the Yunnan No. 1 Prison. All the engines were alleged by the factory manager to be produced at the factory. Thus, CDI's theory that only the X195 was made with prison labor does not withstand scrutiny. The court does not credit the testimony of plaintiff's witness, Mr. Lin, who holds a high position in the Chinese government-owned corporation that trades in the JINMA product line. He was extremely nervous when questioned about the status of JINMA and claimed to have no knowledge as to its official status. The court believes he was withholding information that a person in his position should have known.

employees, yet the production and warehouse workers were said to number only between 100 and 150, spread over three shifts. Obviously, the administration was more in keeping with a greater work force, either on the premises or elsewhere, than was alleged. The court doubts the credibility of the factory manager on this point.

Next, the factory manager defended the plant against "local talk" that it was a prison by explaining that the facility was originally established to provide work for families of prison employees. Thus, the factory was owned by the Ministry of Justice. This does not comport with Chinese publications that place the factory under the Ministry of Justice because it is a "Reform Through Labor" facility. Further, many of the factory buildings were not open to view, even when a request was made.

Other evidence falls in place as well, such as a prison truck observed leaving from the direction of the JINMA gate, a worker hiding her face from the video camera used by plaintiff during one visit, hesitancy about showing the State Department observers the location of the Yunnan No. 1 Prison wall, a blank space on a city map for both the admitted prison and the factory grounds, and the repeated failure to tender any documentation on production and personnel.[5]

The court concludes that CDI has failed to prove that the JINMA model 1100 diesel engine was not made, in whole or in part, with convict labor. While a portion of the production or certain parts may not have been the result of convict labor, CDI has not demonstrated that the convict labor input is *de minimis*.[6]

■ The court now turns to the second issue. CDI alleges that there are no diesel engines manufactured in the United States capable of providing sufficient reliable continuous power for household use. CDI imports the engines at issue and combines them with alternators to form "generator sets" for sale for such a use. Thus, CDI alleges that the

statutory consumptive demand exception in § 1307 is satisfied. The court agrees, to the extent the exception is applicable.

First, U.S.-made gasoline engines are not substitutable. Gasoline engines are not designed to be a continuous power source. If used in this mode, they wear out very quickly. Furthermore, the volatility of gasoline makes it inappropriate, if not illegal, for storage in sufficient quantities to supply continuous power generation, unless one wishes to install an underground tank at considerable expense.

Second, the only American producer of small diesel engines, Onan Corporation, does not market them in normal commercial channels or quantities. Onan captively consumes its production of small diesel engines in the production of generator sets. While a witness from Onan testified that it sells some diesel engines to customers, the witness was not from the sales department. In addition, neither supporting sales documentation nor advertising of such engines for the relevant years was introduced into evidence. To the contrary, post–1987 trade publications, recognized by the Onan witness as reliable, did not list Onan as a producer of small diesel engines. This is corroborated by the original conclusion of a Customs investigator that U.S. producers do not make an equivalent diesel engine. *See* Pl.'s Ex. 35 (Report of Investigation dated Feb. 26, 1992); *see also* Pl.'s Ex. 36 (statement of Cummins Engine Company (Onan's parent) to same effect). The conclusion was repeated by the Customs investigator at trial.

■ The consumptive demand exception is intended to benefit consumers of the product at issue. To fulfill this purpose, the product must be available. Defendant argues, however, that mere production capability on the part of the domestic industry suffices to defeat this exception. The court is not persuaded. Given sufficient will, U.S. industry is capable of producing almost any product manufactured elsewhere. Finding

---

5. The existence of dormitory facilities on site does not support either party's view, as this fact may be consistent with either ordinary Chinese factory conditions or a prison environment.

6. Furthermore, CDI has not satisfied the elements of the *Hendrick* Rule. *See China Diesel,* 855 F.Supp. at 387 n. 10.

the exception inapplicable because of capability to produce would read the exception out of the statute as to manufactured goods, which are specifically covered. *See* 19 U.S.C. § 1307. Evidence established that a small diesel engine market has existed for at least the past decade, and it is served by merchandise at a variety of prices. If a U.S. manufacturer had the will to enter this market, it would have done so by now. The court concludes that while Onan (or another U.S. manufacturer) might have satisfied domestic demand if it had entered the small diesel engine market in any significant way, it was not a market participant during 1990–92, and its production may not be viewed as available to satisfy such demand.[7]

■ Third, assuming *arguendo* that Onan's capability must be considered, the ability of the Onan engines to serve the particular purpose at issue is in question.[8] Onan's closest substitute can produce 6 to 7 kilowatts of output on a continuous basis when paired with a suitable alternator. The JINMA model 1100 produces 8 to 9 kilowatts continuously. The 6 to 7 kilowatt range would fulfill most household needs, but some customers may require the higher output on a continuous basis.[9] Because another Onan engine exists that could serve customers with higher demand, and because the testimony is not clear as to the actual kilowatt requirements of CDI's customers and exactly how many customers have such high power needs, CDI has not met its burden of proof on the sub-issue of reasonable commercial substitutability.[10] Nonetheless, because the Onan engines generally were not marketed during the relevant time period, CDI prevails on the overall consumptive demand issue.

■ The final question that arises is a legal one.[11] The plain words of the statute indicate that merchandise produced by convict labor is prohibited under any circumstances, and only merchandise produced by non-convict forced labor is subject to the consumptive demand exception. *See* 19 U.S.C. § 1307. Although the statutory definition of "forced labor" is broad enough to include convict labor, to read the statute in this manner would render the separate specification of "convict labor" redundant. Courts are required to give effect to each word of a statute, whenever possible. *United States v. Nordic Village, Inc.,* 503 U.S. 30, ——, 112 S.Ct. 1011, 1015, 117 L.Ed.2d 181 (1992). Further, the legislative history is consistent with this narrower reading of "forced labor." No court, however, has directly addressed this issue,[12] and CDI alleges that Customs' administrative practice is to apply the exception to both convict and non-convict forced labor.

First, Customs' administrative practice is unclear. Language in one administrative ruling, cited by CDI, supports its view, but only in *dicta. See* C.S.D. 79–317, 13 Cust. Bull. 1473, 1474 (1978). Also, evidentiary standards developed by Customs for internal

---

**7.** Because no domestic engines were shown to be available, CDI is not required to prove the specific level of its U.S. demand. It is clear that some domestic demand exists.

**8.** Section 1307 is not clear as to the degree of fungibility with the foreign product that is required. The court concludes from the general purpose of the statute that the merchandise need not be identical or even nearly so, but merely a substitute that would be generally acceptable to the purchaser.

**9.** The experts were in conflict as to the substitutability of the engines in terms of power production and ability to meet household needs. For this purpose, the court is equating CDI's needs with those of its customers.

**10.** Onan's engines cost 4 or 5 times as much as the JINMA engine. Some of that price difference

is attributable to differences in the merchandise. The Onan engines are more sophisticated, and one of the potential substitutes is higher powered. Part of the cost difference, however, is attributable to differing labor costs, as CDI's advertising admits. Thus, as this is a convict labor case, the price differential, which is at least partially attributable to this circumstance, will not result in a finding of non-substitutability.

**11.** The court has chosen to address all factual issues submitted to the court to avoid retrial, in the event that it has committed legal error.

**12.** *McKinney v. United States,* 9 CIT 315, 614 F.Supp. 1226 (1985), *aff'd,* 799 F.2d 1544 (Fed. Cir.1986), a forced labor case, was decided on standing issues only. The issue at hand was not discussed by the appellate court and specifically was left unresolved by this court. *See* 9 CIT at 320 n. 25, 614 F.Supp. at 1233.

guidance purposes do seem to treat convict and non-convict labor identically. *See* Pl.'s Mem. in Supp. of M. for Summ. J., at Ex. 17 (*Enforcement of U.S. Prohibitions on the Importance of Goods Produced by Convict Labor: Hearing Before the Subcomm. on Int'l Trade of the Senate Comm. on Finance*, 99th Cong., 1st Sess. 53, § II 1985)). The evidentiary standards, however, also count voluntary non-domestic production as available to satisfy domestic demand for purposes of the statute. *See id.* at ¶¶ G.1. and G.2. If the non-domestic production aspect of the standards were applied, CDI's case would also fall, as foreign-made substitutes were available.[13] It seems appropriate to reject both aspects of the standards as ill-considered and inconsistent with the statute, and to rely on the most straightforward statutory interpretation, i.e., the consumptive demand exception does not apply to convict-made goods, and its applicability is unaffected by non-convict or non-forced labor foreign production.

■ Second, as indicated, the legislative history comports with the plain language of the statute. The convict labor prohibition existed before the statute was amended to cover forced labor and indentured labor under penal sanctions, as well as to provide for a consumptive demand exception. *See* Smoot–Hawley Tariff Act of 1930, Pub.L. No. 361, § 307, 46 Stat. 590, 689 (June 17, 1930). A proposal that would have applied the exception more broadly was not enacted. *See Hearings on H.R. 2667 before the Sen. Comm. on Finance*, 71st Cong., 1st Sess. 160, 308 (1929). (Special and Administrative Provisions) (statement of L.R. Mason). During the *Smoot–Hawley* debate, concern was expressed that rubber supplies produced with indentured labor should not be interrupted. Any concern about products made with convict labor was not mentioned. 71 Cong.Rec. 4488, 4490, 4494 (Oct. 14, 1929). Furthermore, discussion in 1931 of a proposed amendment contains specific reference to the non-applicability of the consumptive demand provision to convict labor. 74 Cong.

Rec. 5673, 5676 (Feb. 21, 1931) (statement of Cong. Chindblom). This legislative history is so close in time to the original enactment that it has some weight.

Accordingly, the court finds that the JIN-MA model 1100 diesel engines detained by Customs, which are the subject of this action, are convict-made and are to be excluded from entry into the customs territory of the United States.

---

**13.** European and Japanese substitutes are available at prices considerably higher than those of the CDI model. Non-convict-made Chinese substitutes are also available, although CDI alleges that they are inferior to the JINMA engines.